Billy Wayne WHITE, Appellant,

v.

The STATE of Texas, Appellee.

No. 62780.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 23, 1981.

Rehearing Denied Nov. 4, 1981.

Certiorari Denied April 19, 1982.
See 102 S.Ct. 1995.

M. LeRoy Peavy, Houston, for appellant.

Carol S. Vance, Dist. Atty. and Michael Kuhn, Larry P. Urquhart and Gerald Flatten, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

The appellant was found guilty of capital murder and placed under a judgment of death. He sets out fourteen grounds of error.

■ In the first ground he argues that the judgment and verdict are void because the jury heard evidence, as well as the State's opening statement, before all the jurors had taken the oath prescribed by V.A.C.C.P. Article 35.22. The venire members were examined individually on voir dire, as V.A.C.C.P. Article 35.17, Section 2, permits. The trial court administered the jury oath to each juror separately after he was accepted for the jury. This practice of separately swearing jurors in capital cases was required under former law, but it has

not been required under the present Code of Criminal Procedure since December 31, 1965. *See* Onion, "Special Commentary," 2 *Vernon's Annotated Code of Criminal Procedure of the State of Texas* 624 (1966). In this case the trial court failed to administer an individual oath to the third juror who was accepted. No objection was made at that time, and the matter apparently escaped the attention of everyone.

The taking of evidence commenced with the testimony of an eyewitness. He testified that he was working across the street from the scene of the murder, that he heard a noise like a firecracker come from across the street, and that he saw a man with a gun running away from the scene. At this point the jury was retired so that the court could rule on the appellant's motion to suppress this witness's testimony of identification (a ruling which we shall consider below). The court overruled the motion, and then said:

"May we have the jury—wait just a minute. It has been mentioned to me that I did not swear the jurors. But we swore them individually as I recall. I thought I swore all of them as each of them were selected, but probably in an abundance of precaution it might be a good idea to swear them at this time again. But I know I had it written out at the time in front of me and tried to do it.

"Do you have any independent recollection, Mr. Peavy, of any of the jurors not being sworn?

"MR. PEAVY [Defense Attorney]: As I recall, every single one of them was sworn in, the best I recall.

"MR. URQUHART [Prosecutor]: That's my recollection, Judge, that each were individually sworn.

"THE COURT: All right, bring them out, and I will.

\*  \*  \*  \*  \*  \*

"(Jury returns to jury box.)

"THE COURT: Ladies and gentlemen of the jury, before I proceed, let me ask you, did I swear each of you as you were selected as a juror during the past three

weeks? Were there any of you that were not sworn? Do you remember?

"After the Court questioned you, after both the State and the Defendant had an opportunity to question you, it was the Court's intention at least to have each of you sworn as a juror in this case.

"Were there any of you that were not sworn? My independent recollection is that you were all sworn, but I suppose in an abundance of precaution it might be well that I ask all of you to stand and raise your right hands again, so there be no question concerning your having been sworn.

"(The jury was administered the oath by the Court.)"

The State then resumed the examination of the witness. It did not seek to re-introduce or repeat the testimony that had been given earlier.[1]

It has been held that the complete failure to administer the proper jury oath is a reversible error that may be raised for the first time on appeal. *Howard v. State*, 80 Tex.Cr. 588, 192 S.W. 770 (1917). But the rule is not the same if the proper oath was given, but merely given untimely. *Id.* In the case of an untimely oath, as was held in *Caldwell v. State*, 12 Tex.App. 302, 316 (1882),

> "[t]he question presented is this: Will this court reverse a judgment for these irregularities, when the defendant made no objection at the time, taking his chance of being acquitted by this jury thus sworn, and holding in reserve this matter to be used in his motion for new trial, and, on failure then, to be used in this court as ground for reversal of the judgment? We think not."

*Accord, Northcutt v. State*, 154 Tex.Cr. 600, 229 S.W.2d 373 (1950).

In this case the proper jury oath was administered; the only problem was that the oath was not administered timely. This could not render the verdict void. The appellant made no objection to the procedure (and, in fact, told the court that all the jurors had been sworn individually). He may not raise this complaint for the first time on appeal.

In his second ground of error the appellant claims that two jurors were disqualified because they were not asked to "state[ ] under oath that the mandatory penalty of death or imprisonment for life will not affect [their] deliberations on any issue of fact"; V.T.C.A., Penal Code, Section 12.31(b). As we held in *Smith v. State*, 540 S.W.2d 693, 698 (Tex.Cr.App.1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977), Section 12.31(b) does not constitute a separate oath to be administered in its own terms to each venire member, but rather is merely one criterion of qualification. The fact that the venire members were not asked this question did not render them disqualified.

The appellant expands on this theme in his third ground of error, in which he argues that the other ten jurors, who were asked the Section 12.31(b) question, were disqualified because the record does not show that they were under oath during the voir dire. This argument was raised and rejected in *Duffy v. State*, 567 S.W.2d 197, 200–201 (Tex.Cr.App.), *cert. denied*, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978), and what we said there need not be repeated. "The Court of Criminal Appeals shall presume . . . that the jury was properly impaneled and sworn . . . unless such matters were made an issue in the court below, or it otherwise affirmatively appears to the contrary from the record." V.A.C. C.P. Article 44.24(a). No such issue was made below, and the contrary does not affirmatively appear.[2] No error appears.

The fourth ground of error is that the court erred in excusing Venire Member Barbara Jean Grace. The appellant con-

---

1. Compare *Woodkins v. State*, 542 S.W.2d 855, 860–861 (Tex.Cr.App.1976); *Patterson v. State*, 416 S.W.2d 816, 820–821 (Tex.Cr.App.1967).

2. In fact, we notice the trial court's remark to the first twenty members of the venire, "Now let me ask you this then collectively—and remember that you have been sworn as jurors . . . ."

tends that Grace was not so opposed to the death penalty as to have satisfied *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The merits of this ground were not preserved for appellate review, for no such objection was made at trial. *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App., 1980; rehearing denied, April 15, 1981), *cert. denied*, 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).

The appellant next complains that the trial court erred in refusing to let him examine Venire Member Grace. The trial court began the examination of Grace, as it did that of all the venire members,[3] by explaining the difference between murder and capital murder. The court then asked Grace if she could consider death as a penalty; she expressed some reluctance. The court pursued the matter, asking if Grace could "assume that responsibility . . . and would write a death penalty?"

"A   Yes, I guess I could, but—

"Q   Now, see, you say you guess. Well, you're not saying that under no circumstances would you ever consider the death penalty, are you? You can imagine a far out case in which the death penalty, if the law provides it, that a person should receive it, can you not?

"A   Yes, I can imagine that.

"Q   And if you reach that point to where somebody gave you that type of case, the evidence was there and you felt beyond a reasonable doubt that that was a proper verdict, could you and would you write that verdict?

"A   I'm going to have to say no.

"Q   Well, you're the only one that knows. Can you tell us why you would not?

"A   Well, it's just that even though I know that, you know, death would be the proper verdict and everything, it just seems like in my heart I wouldn't be able to do that, I just couldn't. I just don't feel that I could just say death to this person.

"Q   You understand, of course, you would not be saying death. You would be writing the answers that you know would mean that the judge would be the one that would be sentencing the person to death. You understand that?

"A   Uh-huh.

"Q   And you would answer those questions so that the judge would not be forced to give the individual death; is that what you're saying?

"A   Right. At least I would not give him death. So, therefore, I would want the judge to not give him death also.

"Q   Consequently, you would make your answers so that he could not receive death as a penalty; is that right?

"A   Yes, sir. Even though I know what's right, I know what you're saying, you know; but deep in my heart, I just don't feel like I could write death to a person. So, therefore, I would want the judge to consider not giving death to him.

"Q   Well, Miss Grace, of course there's nobody that can find any fault with how you feel. You're the one that has to make that decision. I told you yesterday we would find no fault with you, didn't I?

"A   Yes, sir.

"Q   Nobody is going to find any fault. All we need to know, are you so pre-committed that regardless of how right you thought it was you would never write a verdict that would represent the death penalty?

"A   Right. Now, I have to say no.

"Q   When you say now, explain that.

"A   No, I just could not do it. I just don't think I could.

"MR. URQUHART: I would make a motion, Your Honor. I believe that the lady is being honest with the Court.

"MR. PEAVY: I'd like to ask her just a few questions, Your Honor.

3.   Neither party objected to this procedure.

"MR. URQUHART: Regardless of what she says now, I mean the record is clear at this point.

"MR. PEAVY: Just maybe the Court could ask her if there's any conceivable situation, such as a far-out situation like a terrorist or mafia member who was threatening everybody in the courtroom—the question is whether there is some situation that she would consider the death penalty.

"Q (By the Court) I gather from what you tell me that there are no circumstances, are there, that you would ever consider the death penalty, or am I wrong?

"A No. Huh-uh. Even if it was a terrorist or something, I would still feel that in my heart, you know, that the judge should give some other penalty besides death. I just don't feel like I could do it.

"MR. URQUHART: I renew my motion.

"MR. PEAVY: Your Honor, we object to the witness being, the juror, prospective juror, being excused unless we have the opportunity to question her a little more thoroughly.

"THE COURT: Doesn't the statute make a provision? Is the Court limited after she has—

"MR. URQUHART: That's what I'm trying to say. Whatever he can get her to say now, the record is clear at this point how she feels.

"MR. PEAVY: Your Honor, I feel that I have a right to question a juror myself on behalf of the defendant.

"THE COURT: Get me the statute. I think the statute provides that after she has committed herself that the Court has no further right to question her or that either side does. Do you have the statute there?

"MR. URQUHART: Judge, now there may be something in the Code of Criminal Procedure. I have 1231 B: 'The judge must excuse the juror.'

"THE COURT: All right. Thank you, ma'am. You will be excused. * * *"

The court erred in not granting the appellant's request to examine Grace further. Such errors are not reversible when, as here, the record shows that the venire member was questioned at length and that she unequivocally stated that she could not vote for the death penalty under any circumstances. *Burns v. State*, 556 S.W.2d 270, 276–278 (Tex.Cr.App.), *cert. denied*, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977); *Huffman v. State*, 450 S.W.2d 858, 860 (Tex.Cr.App.1970), *death penalty vacated*, 408 U.S. 936, 92 S.Ct. 2860, 33 L.Ed.2d 753 (1972). *See Ortega v. State*, 462 S.W.2d 296, 303–304 (Tex.Cr.App.1970). In this case we also note that the appellant did, in effect, pose one question to Grace. This question, about "a far-out situation like a terrorist," was the appellant's principal inquiry to other venire members who expressed reservations about the death penalty. This ground does not present reversible error.

■ In his sixth ground of error, the appellant complains that the trial court refused to let him ask certain questions of one venire member. The appellant asked the venire member if he would be unable to consider the penalty of confinement for life if it were proved that the defendant went into a store, "attempted to rob it or robbed it," aimed a pistol at a woman's head at short range and shot her, killing her instantly, and if the woman's husband testified to that. (This was an accurate statement of what the State's case would be.) The State's objection was sustained. The appellant eventually was permitted to ask if the venire member could return a verdict of life in prison if it were proved that a defendant shot someone in the head in the course of committing a robbery. There was no error in refusing to let the appellant ask a hypothetical question that was based on the facts peculiar to the case on trial. 35 Tex.Jur.2d "Jury," Section 116 (1962). In fact the question that was permitted had more details than the appellant was entitled to ask. This ground has no merit.

■ Grounds seven, eight, and nine complain of the court's overruling seven challenges for cause. The appellant peremptorily challenged all seven venire members, so they did not become jurors. The appellant did not request additional peremptory challenges. He did not state that he was forced to accept any juror who was unacceptable to him. No reversible error appears. *See, e.g., Payton v. State*, 572 S.W.2d 677 (Tex. Cr.App.1978); *Hernandez v. State*, 563 S.W.2d 947, 948 (Tex.Cr.App.1978); *Adami v. State*, 524 S.W.2d 693, 700 (Tex.Cr.App. 1975).

■ The tenth ground complains of the admission of three photographs which showed the entry and exit wounds made by the fatal bullet. These photographs illustrated the medical examiner's testimony. These were not autopsy pictures. *Cf. Terry v. State*, 491 S.W.2d 161 (Tex.Cr.App.1973). They were admissible. *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972).

■ The eleventh ground argues that the in-court identifications of the appellant by Alge Spinks and Mack Alford should have been suppressed because they were tainted by a suggestive show-up. *See generally Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

Spinks was the deceased's husband. He owned a furniture store which he and the deceased operated. On August 23, 1976, a man came to the store as the Spinkses were about to close it. He was admitted and "walked about halfway over the store," asking questions about merchandise. He selected some lamps. As the deceased went into the office to get the "ticket book," the man pulled a gun and demanded money. Spinks gave him about $250 to $260 and went into the office with the deceased, as the man ordered. The man demanded Spinks' billfold, which was surrendered. The man shot the deceased. He next ordered Spinks to lie down, then to open the safe, then to lie down again; Spinks obeyed. The man then asked if the deceased had watches and rings; as he lifted the deceased's arm, he dropped his gun. Spinks grabbed it, and the men "scuffled." As

they fought for control of the gun, Spinks fired it twice. Then he managed to get up, run out of the store, and call to Alford who was across the street. Spinks saw the man running around the corner. He had been in the store four or five minutes.

Alford saw a man run from the store and around a building. He got a good look at the man, who was black, wearing a red cap, carrying a nickel-plated gun, and "kind of hopping with one leg." Alford heard Spinks call for help. He flagged down a police car, and the officers broadcast a description of the man.

Officer Nieto responded to the call. He saw a black man, wearing a red cap, walking at a fast pace about two and a half blocks from the store. Nieto told the man to stop and raise his hands. The man did so, revealing a pistol in his waistband. Nieto arrested the man, who was the appellant. The appellant had been shot in the groin area. He had $269.62 in his pants pocket. One of the bullets found at the scene was identified as having been fired from the appellant's gun.

The appellant was taken to the furniture store within fifteen or twenty minutes after the offense. Spinks and Alford were told that someone had been arrested and were asked to look at him to see if he was the man. They each looked at the appellant, who was seated in the back of the police car, not wearing a hat. Each said that the appellant was the man. They denied that the police made any suggestive comments and they were positive in their in-court identifications. We conclude from the totality of the circumstances that their identifications were not tainted and that their testimony was admissible.

In the twelfth ground of error the appellant argues that Section 12.31(a) of the Penal Code denies due process by failing to provide a reasonable alternative to the death penalty. He says that jurors' knowledge of the possibility of parole being granted if a defendant is given life makes it almost a certainty that they will vote for death. (There is no contention that the

jurors discussed parole in this case.) He says that a punishment of confinement for life without parole would be a more reasonable alternative.

■ In a capital trial, as in any other trial, the matter of parole is not a proper consideration for the jury's deliberations on punishment. *O'Bryan v. State*, 591 S.W.2d 464, 478 (Tex.Cr.App.1979), *cert. denied*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980). *See Freeman v. State*, 556 S.W.2d 287, 304 (Tex.Cr.App.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978). Yet it is common knowledge that from time to time inmates of the Department of Corrections are released on parole, and the mere mention of that fact is not a denial of a fair and impartial trial on the issue of punishment. *Heredia v. State*, 528 S.W.2d 847, 852 (Tex.Cr.App.1975). This being so, the jurors' mere possession of this common knowledge, without even mentioning it during their deliberations, would not constitute a denial of due process. Whatever merit another punishment might have, the choice of punishments is for the Legislature so long as it is not contrary to the provisions of the Constitution. *Dendy v. Wilson*, 142 Tex. 460, 179 S.W.2d 269, 273 (1944). *See Ex parte Granviel*, 561 S.W.2d 503, 515 (Tex.Cr.App.1978). We find no constitutional violation here.

■ The thirteenth ground is, "Capital punishment is cruel and unusual punishment, per se." This contention always has been rejected by the United States Supreme Court and this Court.

■ The fourteenth ground states, "The appellant expects to develop new evidence to present that he was incompetant [sic] to stand trial at the time of his trial . . . ." This ground presents nothing for us to review.

The judgment is affirmed.

CLINTON, Judge, concurring.

My views about continued application of the contemporaneous objection rule judicially crafted by the Court in *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976), cert. denied, 430 U.S. 959 (1977)—after at least four years of entertaining *Witherspoon*[1] challenges to exclusion of prospective jurors without requiring an objection to be voiced[2]—have been recently expressed in *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App.1981). Without reiterating them, it is enough to observe that the *Boulware* Court seems to have been overly influenced by the pronouncements of the Supreme Court of the United States with respect to provisions of the federal rule of criminal procedure and federal habeas corpus consideration of claimed deprivation of constitutional rights during the course of a state criminal prosecution. See *Boulware*, at 679–681. So I disagree with the declaration of the Court in the case at bar that ground of error four was not preserved for review "for no such [*Witherspoon*] objection was made at trial."

Further, in reading portions of the voir dire examination of veniremember Grace quoted in the majority opinion to address the fifth ground of error, it seems to me that the objection that was made after the prosecutor renewed his motion[3] came in a

1. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

2. Indeed, defense counsel in *Tezeno v. State*, 484 S.W.2d 374, 382–383 (Tex.Cr.App.1972) expressly stated, "No objection," when the State challenged for cause; the Court still reasoned that such "waiver of objection apparently will not, in itself vitiate an improper challenge," but is a factor to be considered when the meaning of a response by a venireman is uncertain, *id.*, at 383, n. 2. There was not a contemporaneous objection in *Hovila v. State*, 532 S.W.2d 293 (Tex.Cr.App.1975), still the Court, without even mentioning the possibility of waiver, examined

the voir dire and held that several veniremember were improperly excused under *Witherspoon*. Accordingly, observing that "a contemporaneous objection rule . . . apparently did not even exist" at the time Kenneth Granviel was tried in October 1975, the Fifth Circuit has just now vacated the death sentence imposed on him. *Granviel v. Estelle*, 655 F.2d 673 (CA 5 1981).

3. " . . . we object to the prospective juror being excused unless we have the opportunity to question her a little more thoroughly." Interestingly the Court finds error in not granting the request, but also holds the error is not

contexual setting that the point of counsel's objection was clearly understood by all concerned. See *Zillender v. State,* 557 S.W.2d 515 (Tex.Cr.App.1977).[4] They were then and there in the throes of examining the veniremember for purposes of *Witherspoon* when matters reached the point that prompted the prosecution to "make a motion"—a motion whose grounds and desired relief were not stated but whose thrust was patently directed toward excusal of Grace as a prospective juror on account of her scruples regarding imposition of the death penalty. Resisting the motion thus understood, appellant's lawyer sought to question Grace "a little more thoroughly," and that brought the colloquy in which the trial judge opined that "the statute provides that after she has committed herself" further questions were barred—meaning most assuredly questions about whether she would automatically vote against imposition of capital punishment. And then, only after the statement concerning Section 12.31(b) of the Penal Code, did the trial court excuse the veniremember.

Accordingly, satisfied that all understood exactly the import and impact of the stated objection of appellant, I would not refuse to review the merits of ground of error four. Nevertheless, I agree with the assessment of the Court that the record shows that Grace made "unmistakably clear" a determination that "there are no circumstances ... that [she] would ever consider the death penalty." [5]

Therefore, except as noted, I join in the opinion and concur in the judgment of the Court.

TEAGUE, J., joins.

reversible because Grace "unequivocally stated that she would not vote for the death penalty under any circumstances."

4. "Thus, where the correct ground of exclusion was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection," 557 S.W.2d, at 517.

5. I emphasize that "the record shows" her determination as finally stated to the trial judge.

Up to that point she appears to have equivocated somewhat, particularly if what she actually said in one response to whether she would *never* write a death penalty verdict was "Right now, I have to say no," rather than, as the reporter transcribed it, "Right. Now, I have to say no." This exchange demonstrates the utmost importance of accurate reporting which, of course, one must assume was done here.