Clydell COLEMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 71001.

Court of Criminal Appeals of Texas, En Banc.

April 13, 1994.

Rehearing Denied June 15, 1994.

Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, Dist. Atty., and Crawford Long, Asst. Dist. Atty., Waco, Robert Huttash, State's Atty., Austin, for State.

## OPINION

McCORMICK, Presiding Judge.

Appellant was convicted by a jury in McLennan County of capital murder. V.T.C.A., Penal Code, Section 19.03(a)(2). After the jury answered the special issues in the affirmative, the trial court imposed the death penalty as required by Article 37.071, V.A.C.C.P. In an automatic, direct appeal to this Court, appellant's counsel raises twenty-six points of error in an original brief and two points of error in two supplemental briefs. We will affirm.

Because appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to special issue two, we summarize the facts relevant to this issue. Article 37.071(b)(2), V.A.C.C.P. The record reflects on February 24, 1989, in Waco, the eighty-seven year old victim was murdered in her home by strangulation. Fingerprints at the scene connected Yolanda Phillips to the murder. Phillips eventually implicated appellant in the murder and testified against appellant pursuant to a plea bargain with the State.

Phillips testified she and appellant forcibly entered the victim's residence to obtain mon-

ey and property to buy drugs. Appellant confronted the victim, threw a blanket over her head, struck her in the head with a hammer, and then strangled her with one of her stockings. Phillips described property she and appellant removed from the victim's home and sold to various buyers for minor sums. Several witnesses testified appellant sold them property belonging to the victim. Appellant's defensive theory was that Phillips committed the murder.

At the punishment phase, the State presented evidence of appellant's burglary convictions in 1957, 1966, and 1984, and a forgery conviction in 1974. The State also introduced evidence that while serving time in prison appellant had a bad reputation among the other inmates for being dangerous. The State also introduced evidence that while burglarizing the home of an eighty-eight year old lady in August of 1988, appellant threw a blanket over her head and held a can opener to her throat.

■ In point of error six, appellant claims the evidence is insufficient to support the jury's affirmative answer to special issue two which asked the jury to determine whether there is a probability appellant would commit criminal acts of violence that would constitute a continuing threat to society. See Article 37.071(b)(2). Viewing all the evidence in the light most favorable to the verdict, we must determine whether any rational finder of fact could have affirmatively found the second special issue beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see *Burns v. State,* 761 S.W.2d 353, 356 (Tex.Cr.App.1988). The jury may consider the evidence from the guilt-innocence phase and the punishment phase in arriving at an answer to the second special issue. *O'Bryan v. State,* 591 S.W.2d 464, 480 (Tex.Cr.App.1979); *Crane v. State,* 786 S.W.2d 338, 354 (Tex.Cr.App.1990).

The evidence reflects appellant committed a deliberate and brutal murder and his conduct displayed a total disregard for human life, personal dignity of others, and the ownership of property. See *Barney v. State,* 698 S.W.2d 114, 118 (Tex.Cr.App.1985); *Hawkins v. State,* 660 S.W.2d 65, 82 (Tex.Cr.App. 1983). In the instant offense, appellant

threw a blanket over the eighty-seven year old victim's head, hit her in the head with a hammer and strangled her with her own stocking. Appellant committed a similar offense against an eighty-eight year old victim only seven months before this offense. The evidence is sufficient to support the jury's affirmative answer to special issue two. See *Barney v. State,* 698 S.W.2d at 117–119; *Hawkins v. State,* 660 S.W.2d at 82. Point of error six is overruled.

■ In supplemental point of error one, appellant contends Phillips' accomplice-witness testimony was not corroborated by other evidence tending to connect appellant to the offense. See Article 38.14, V.A.C.C.P. The State presented evidence, independent of Phillips' testimony, that appellant sold some of the victim's property shortly after the murder. Appellant told one witness in August of 1988 he robbed the victim before and planned to do it again. Appellant told another witness about two weeks before the murder he intended to rob the victim again and kill her, if necessary, because she knew appellant. Appellant admitted to another witness, after the murder, he had been inside the victim's home and had taken some of her property. Appellant ran when the police came to question him about the murder. There is evidence, independent of Phillips' testimony, connecting appellant to the offense. See *Anderson v. State,* 717 S.W.2d 622, 631 (Tex.Cr.App.1986); *Moore v. State,* 700 S.W.2d 193, 203 (Tex.Cr.App.1985). Supplemental point of error one is overruled.

■ Appellant's eighth point of error asserts the trial court erred in sustaining the State's challenge for cause to veniremember Laws based on his attitude regarding the death penalty. The State claims the trial court did not abuse its discretion in granting the challenge for cause because the veniremember's attitude about the death penalty would have prevented or substantially impaired the performance of his duties as a juror in accordance with his oath and the instructions of the court. See *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Knox v. State,* 744 S.W.2d 53, 58 (Tex.Cr.App.1987); *Montoya v. State,* 744

S.W.2d 15, 19 (Tex.Cr.App.1987); *Cordova v. State*, 733 S.W.2d 175, 186 (Tex.Cr.App.1987). We apply a deferential standard of review of a trial court's ruling granting a state's challenge for cause. *Moody v. State*, 827 S.W.2d 875, 886 (Tex.Cr.App.1992). The initial exchange between Laws and the prosecutor reflected that based on his opposition to the death penalty, the veniremember could not affirmatively answer the special issues:

> "Q. (by State) Okay. And is this both because you are personally opposed to the death penalty and because you know him, is that right?
>
> "A. No.
>
> "Q. Okay.
>
> "A. I just don't believe in it.
>
> "Q. Okay.
>
> "A. I just don't believe in taking, you know, taking no man's life.
>
> "Q. All right, sir. You just don't feel that that's proper, do you?
>
> "A. No.
>
> "Q. Okay. And let me ask you, under any set of facts, do you think you could ever return a death penalty?
>
> "A. No.
>
> "Q. Okay. Even if it was a real bad murder or something, could you—do you always think you ought to return a life sentence or less?
>
> "A. The way I feel that's left up to—Well, I'm a Baptist.
>
> "Q. Yeah.
>
> "A. I believe the Baptist way.
>
> "Q. All right. Is it like my mother, she didn't believe in it religiously because of her religious beliefs?
>
> "A. Yeah, I just believe in what the Bible says.
>
> "Q. Okay. That's the way my mom felt. She said—felt the Bible say you shouldn't take a life, you know.
>
> "A. That's true.
>
> "Q. That's the way she believed and she could never, regardless of what the evidence was she could never have answered those questions yes to return a death penalty. You know, do you feel the same way?

> "A. Yes.
>
> "Q. And even think of the worse [sic] crime that a person could commit, would you always think that the special issues ought to be answered no so that he would get a life sentence rather than a death sentence?
>
> "A. Yes.
>
> "Q. All right, sir.
>
> "Mr. Long: At this time, Your Honor, we'll challenge this witness for cause on the inability to follow the death penalty.
>
> "The Court: All right, sir."

Appellant attempted to rehabilitate veniremember Laws:

> "Q. (by appellant's attorney) But let's say that the State has presented their evidence and you have no reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. If you had no reasonable doubt that that was true, would you answer—could you answer this special issue yes?
>
> "A. Well, I couldn't answer yes because I wouldn't know.
>
> "Q. Well, after you heard all the evidence, okay?'
>
> "A. Uh-huh.
>
> "Q. You heard all the evidence.
>
> "A. Uh-huh.
>
> "Q. You would have to answer this special issue either yes or no.
>
> "A. Oh, yeah, I could.
>
> "Q. Okay. If you have a reasonable doubt you would answer it no.
>
> "A. Uh-huh. Yeah.
>
> "Q. Because that is what the law would tell you to do.
>
> "A. Uh-huh.
>
> "Q. If you had no reasonable doubt, if the State had proved it to you beyond a reasonable doubt, the law would say that you would have to answer it yes. Could you follow the law and do that?
>
> "A. Follow the law and do that?
>
> "Q. Yes, sir.
>
> "A. Well, I have to go by the law.

"Q. And you—So do you feel if the State proved to you beyond a reasonable doubt that you could answer special issue number two yes?

"A. (no response)

"Q. See, Mr. Laws, the real question is you know, both the State and the Defense are entitled to a juror who can be fair to both sides.

"A. Yeah.

"Q. Do you understand that?

"A. Uh-huh.

"Q. That's the reason I said at first no matter what your personal feelings or your personal beliefs are, can you set those beliefs aside and can you follow the law?

"A. I don't—are you talking about the way I feel? Like you say, like could follow the law leaving what I think about the case.

"Q. And you can follow the law and do what the Court directs you to do. You feel like you can follow the law.

"A. I will try.

    \*    \*    \*    \*    \*    \*

"Q. Could you answer those special issues yes? Could you follow the law and answer those yes?

"A. If it's right.

"Q. Do what, sir?

"A. If it's what is right, yeah. I can answer them yes or no. Yes, I can do that.

"By Mr. Goains: Your honor, we feel the juror is qualified.

"The Court: Overruled."

The prosecutor then questioned the venire-member:

"Q. Okay. Now knowing that, knowing now what you understand that if you answer both questions yes that you would tell the Judge that he has to give Clydell Coleman the death penalty. And the Judge doesn't have any choice. If you answer both those yes he's got to sentence Clydell Coleman to death and he'd be taken down and strapped down and have that needle injected into him, you know, and killed. Would you answer those questions yes if you knew that that was going to get Clydell Coleman the death penalty?

"A. I don't believe in it.

"Q. Okay. So let me ask you this. Would you feel like you would answer those questions no in order that he not get the death penalty, because if answer to them no then he would not get the death penalty?

"A. I still don't believe in the death penalty. Just like I said on the paper, I just believe in you know....

"Q. You believe in a life sentence, right?

"A. I believe in punishing a person for what he done did wrong.

"Q. Yeah, but not the death penalty, is that right?

"A. I just don't believe in it.

"Q. Okay. Let me ask you this. You don't believe in the death penalty. You feel very strongly against it, don't you?

"A. Yeah.

"Q. And that's your perfect right as a citizen, sir. So knowing that if you answer them yes, you're telling the Judge, 'Judge, I'm telling you, you know, to sentence this man to death.' What you answer means the Judge has to sentence him to death?

"A. I told you—like I said, I just don't believe in the death penalty because like I said I just don't believe in me being up there taking another man's life."

"Q. All right. Do you feel that's something that you just shouldn't do?

"A. Right.

"Q. Okay. Do you feel like it would make you—impair your—do you feel like it would make it difficult for you to sit on a jury knowing it was a death penalty case?

"A. Well, if I was going to do that, that's my feeling.

    \*    \*    \*    \*    \*    \*

"Q. Okay. So Mr. Laws, the way that the questions are answered there, these things are answered yes or no. The jury has to answer them yes or no. If you knew that answering these questions yes was going to get Clydell Coleman the death penalty, I have to ask you would you answer them yes?

"A. If I know he was going to get the death penalty?

"Q. Yes.

"A. I still don't—Like I say I don't believe in the death penalty."

"Q. All right. And you don't believe in the death penalty so what would you do if you were asked to answer these yes?

"A. I wouldn't want to. Like I say, I don't believe in the death penalty so I don't see how I hardly could.

"Q. Okay.

"A. I don't believe in it. That is my belief."

■ Appellant contends the trial court erroneously excused the veniremember because he could set aside his attitude about the death penalty and follow his oath as a juror. The record reflects veniremember Laws vacillated in his responses. See *Barefield v. State*, 784 S.W.2d 38, 44 (Tex.Cr.App. 1989). Laws initially said he could not affirmatively answer the special issues, then said he could, and then said he did not see how he "hardly" could in response to the prosecutor's final questions. We afford due deference to the trial court because it is in the best position to evaluate the responses of a veniremember. *Montoya v. State*, 810 S.W.2d 160, 169 (Tex.Cr.App.1989). Given the totality of veniremember Law's voir dire examination, we are unable to hold the trial court abused its discretion in sustaining the State's challenge for cause to veniremember Laws. See *Cordova v. State*, 733 S.W.2d 175, 183 (Tex.Cr.App.1987). Point of error eight is overruled.

In points of error nine through fifteen, appellant asserts the trial court's rulings during voir dire deprived appellant of the right to exercise effectively his peremptory challenges. In point of error nine, appellant asserts the trial court abused its discretion in limiting his questioning of veniremember Payne:

"Q. (by Mr. Goains) And basically what I'd like to—a couple areas that I'd like to go into right now is what they call mitigating circumstances, things that you can use or mitigating factors that you can take into consideration in your answering these two special issues. Ms. Payne, let's suppose that the evidence showed that the defendant had a troubled family history, you know, that there was sexual abuse or you know, beatings by the father or the mother, just very—what you and I would consider very poor family conditions. Do you feel that you would be able to consider that as a mitigating circumstances that would call for a less severe penalty?

"(Mr. Strother): Your honor, I will object to the question as trying to commit the juror to considering that as a mitigating factor.

"(The Court): Sustained. Ma'am, do you understand that in considering the punishment that you—that the answer to the two special issues on the punishment phase, that you would be obligated to consider all the evidence, that evidence that was admitted in the first phase of the trial and whatever additional evidence, if any, was admitted in the second phase of the trial, whether it be evidence of aggravation or prior criminal history, or mitigation evidence, that you would be entitled and have a duty to consider that entire—all of that evidence, whatever the history that was offered and so forth, and then answer the questions in accordance to whatever the evidence justified, no matter what that evidence is.

"Ms. Payne: Yes.

"The Court: Can you do that?

"Ms. Payne: Yes."

■ Appellant asserts the trial court abused its discretion by refusing to allow him to ask the veniremember whether she would consider appellant's troubled family history

as mitigating evidence. The trial court did not abuse its discretion in refusing to allow appellant to ask questions based on facts peculiar to the case on trial. See *Allridge v. State,* 762 S.W.2d 146, 163–64 (Tex.Cr.App.), cert. denied, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1988); *White v. State,* 629 S.W.2d 701, 706 (Tex.Cr.App.1981), cert. denied, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982). Moreover, the veniremember said she would consider all the evidence in answering the special issues, and follow the trial court's instructions; the law does not require a veniremember to give any specified weight to a particular piece of evidence. See *Cuevas v. State,* 742 S.W.2d 331, 346 (Tex.Cr. App.1987), cert. denied, 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988); *White v. State,* supra. Point of error nine is overruled.

█ In points of error ten, eleven and fourteen, appellant contends the trial court abused its discretion in refusing to allow him to ask veniremembers Schroeder, Carlile, and Wiethorn whether they could consider appellant's good conduct in jail as mitigating evidence. In points of error twelve, thirteen and fifteen, appellant contends the trial court abused its discretion in refusing to allow him to ask veniremembers Etchison, Kenney and Walts whether they could consider a troubled family background as mitigating evidence. We overrule points of error ten through fifteen for the same reasons we overruled point of error nine.

In point of error sixteen, appellant contends the trial court erred by refusing to grant appellant's motion to quash the jury panel. Appellant asserts several veniremembers returned their jury cards, claimed specific *disqualifications* from jury service and did not attend the voir dire examination. Appellant objected to the excusal of the absent veniremembers and moved to quash the jury panel:

"Mr. Reaves: We would also—it's my understanding that we sat down yesterday, and there were a number of jurors who have returned cards. There were a number of jurors who returned cards claiming there are exemptions. There were also a number of jurors who returned cards claiming disqualifications. We would object to excusing jurors who have claimed disqualifications solely by claiming that disqualification on the jury card for the reason that that is not a proper manner of claiming exemptions or disqualifications, not a proper manner of determining disqualifications for a jury panel. We would object to excusing those jurors, and move to quash the jury panel for those reasons. "The Court: Overruled."

The record reflects that several veniremembers, claiming disqualifications, merely returned their jury cards through the mail and never appeared for the voir dire examination.[1] However, the State contends appellant did not preserve error for appeal because appellant failed to file a writ of attachment. See *Welch v. State,* 373 S.W.2d 497, 501 (Tex.Cr.App.1963). We agree. The call up and attendance of veniremembers is governed by Article 35.01, V.A.C.C.P.:

"When a case is called for trial and the parties have announced ready for trial, the names of those summoned as jurors in the case shall be called. Those not present may be fined not exceeding fifty dollars. An attachment may issue on request of either party for any absent summoned juror, to have him brought forthwith before the court. A person who is summoned but not present, may upon an appearance, before the jury is qualified, be tried as to his qualifications and impaneled as a juror unless challenged, but no cause shall be unreasonably delayed on account of his absence."

The record reflects appellant failed to seek process to require the absent veniremembers to appear before the trial court. *Welch v. State,* 373 S.W.2d at 501; see also *Jackson v. State,* 745 S.W.2d 4, 18 (Tex.Cr.App.1988); *Dent v. State,* 504 S.W.2d 455, 456–57 (Tex. Cr.App.1974). Appellant has preserved

---

1. At the top of the jury card it states:
   "If you are disqualified or wish to claim an exemption from jury service, under the law, you may fill out the below statement, sign your name and date and return this card to District Clerk Joe Johnson, P.O. Box 2451, Waco, Texas 76703; then you need not report."

nothing for appeal and point of error sixteen is overruled.

◼ In points of error seventeen through twenty-one, appellant claims the trial court erroneously denied his challenges for cause to several veniremembers [2]. In his seventeenth point of error, appellant asserts the trial court erred in rejecting his challenge for cause to veniremember Paula Gail Holt. Appellant contends veniremember Holt should have been excused for cause because of her inability to give effect to mitigating evidence. During questioning by appellant, Holt testified she did not believe appellant's family history and background, a low IQ, and good conduct in jail were relevant in answering special issue two. On questioning by the prosecutor, she said she could consider this evidence in answering the special issues. Upon further questioning by appellant, she testified as follows:

"The Court: I am going to let her answer the question.

"The witness: It would depend on how he had acted in the past. Does he have a— am I permitted to say this?

"Mr. Reaves: Sure.

"A. Does he have a history of violence? Does he have a history of crime? Things of this nature would—would be a factor. Is this the first time he's ever done anything?

"Q. Okay. So basically, you want to look—basically, I think what you're telling me is you want to look at this past history, as opposed maybe to his—just how he grew up or what his family history is.

"A. I think all of it would—if we wanted to take from day one on up, fine, but I would need to know something about his background, yes.

"The Court: Ma'am, do you understand that the defendant is entitled, if someone is found guilty, that they're entitled to present evidence, mitigation evidence, which may or may not include such as his family

history, his mental status, all things about his background? Could you consider all that evidence and then based upon what you, as the judge of the facts proved and the credibility of the witnesses, then could you use that based upon all the evidence that you heard both phases of the trial, and answer the issues either 'yes' or 'no'?

"The Witness: Yes, sir.

"The Court: And would put the burden of proof on the State to require—to prove to you beyond a reasonable doubt that the answers to Special Issue Number 1 was 'yes,' and Number 2 was 'yes.' And if they failed to, could you return a 'no' answer?

"The Witness: Yes, sir.

"The Court: Are you saying that you would automatically exclude any particular evidence, or are you saying that you would listen to that evidence, weigh that evidence, and give it whatever weight that you believe it should be given, and should receive, in reference to the answer to the Special Issue?

"The Witness: I would listen with an open mind and I would give it whatever I felt like it needed. I would be able to answer the question 'yes' or 'no' after listening.

"The Court: I overrule the challenge."

Here, the veniremember said she could listen to all the evidence with an open mind; she was not required to give any specified weight to a particular piece of evidence. *Allridge v. State*, 850 S.W.2d 471, 481–82 (Tex. Cr.App.1991); see *Cuevas v. State*, 742 S.W.2d at 346. On this record, we cannot say the trial court abused its discretion in overruling appellant's challenge for cause to veniremember Holt, or in denying appellant's request for an additional peremptory challenge. Point of error seventeen is overruled.

◼ In point of error eighteen, appellant asserts the trial court erroneously denied his challenge for cause to veniremember Delma Sue Walts. Appellant contends venire-

---

**2.** Except where otherwise indicated, our review of the record indicates appellant preserved these issues for review. See *Harris v. State*, 790 S.W.2d 568, 581 (Tex.Cr.App.1989). The record reflects the trial court granted appellant one ad-

ditional peremptory strike. Therefore, to show reversible error, appellant must show the trial court erroneously denied at least two of his challenges for cause. See *Martinez v. State*, 763 S.W.2d 413, 415 (Tex.Cr.App.1988).

member Walts could not consider appellant's IQ or family history as mitigating evidence:

"Q. Okay. Ma'am, I'd like to ask you a couple of questions briefly on what we call mitigating circumstances. Let's suppose that you know, like there was evidence introduced at the trial that, you know, a person came from a you know, a broken home or on family situation, or you know, there had been sex abuse or beatings or, you know, just didn't grow up in the best home environment. Can you consider a broken family home or that bad family situation to be a mitigating circumstance?

"A. Not really. There is help that you can get. You don't have to go commit a crime. I've lived a rough life myself with home life and I haven't gone out and done a bunch of wrongs.

"Q. So you feel that you could not consider—

"A. Using a broken home for an excuse of a murder?

"Q. Yes, ma'am.

"A. No, I can not.

"Q. So, Ms. Walts, if you heard some evidence, you know, that there was a broken family life or you know, a bad family life, do you think you could consider that when you were answering the special issues?

"A. I don't see why a broken home would cause a person to go out and kill a person.

"The Court: What they're asking you is can you consider mitigation to me may not be to you. (sic) The Defense has an opportunity to offer anything that they believe might be mitigation of in answer to these two special issue number one, you may consider it answer to special issue number two. The number two says whether there's a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society. And they would offer and could offer whatever they believe to be mitigating and then you in turn would consider that in answering the special issues.

"The Court: In other words, could you consider whatever the evidence was and then answer it however you thought they should be answered? In other words, could you consider whatever they offer, consider it and then answer—you've got a right to put whatever weight you want to on the evidence.

"A. Uh-huh.

"The Court: But can you do that? Can you consider the evidence and then answer however you believe the issue should be answered properly?

"A. Yes.

"The Court: All right.

"Q. Let me repeat my question just one more time. What—what I'm really asking is can you consider you know, the broken family as a mitigating circumstance—

"Mr. Strother: Your Honor, I'm going to object to him asking it again and again. She's answered the question. She can consider it.

"The Court: Sustained.

"Q. Ma'am, do you feel that there would be a situation that you could consider that broken family home as a mitigating circumstance?

"Mr. Strother: Your Honor, again, she said yes.

"The Court: I sustain the objection.

"Q. Ma'am, suppose that there was evidence that you heard that while the defendant was waiting in jail, you know, for his trial, that he'd been a good prisoner, that he had not gotten in any trouble, he had kept his cell clean, he had got along with the guards, you know, he had just sort of been a model prisoner. Do you feel that you could consider that good behavior as a mitigating circumstance?

"A. You mean he hasn't caused any trouble with the people in jail?

"Q. Yes, ma'am.

"A. Yes, as long as he's not causing trouble.

"Q. Okay. Which of those two issues do you think that that would be relative to?

"A. Number two.

"Q. Number two?

"A. Yes.

"Q. Ms. Walts, do you think that you could consider his good behavior when you're answering special issue number two?

"A. That's a hard question. I would say he was trying to do better.

"Q. So you think you could consider it in answering that question—

"A. Yes.

"Q. —or special issue?

"A. Yes.

"Q. Ma'am, Ms. Walts, if there was some evidence submitted you know, before you, that a particular defendant had a real low IQ, do you feel that you could consider a low IQ as a mitigating circumstance?

"A. To what extent of the crime.

"Q. Let's say on answering special issue number two, could you consider a low IQ as a mitigating circumstance?

"A. Not really.

"Q. How about in answering special issue number one?

"A. Well, to me that would depend on is the person mentally retarded. I mean, is it just because he hadn't went to school, if that's what you're saying, no.

"Q. Ma'am, basically on the IQ question it's not a matter of you know, how long they had gone to school or how much education they have or that sort of thing, but if you heard some expert let's say testimony, that there had been some IQ testing done and that expert stated that there was low IQ and you believed the evidence, you believed after you listened to all the evidence, you believed that expert's testimony that there was a low IQ, do you feel that you could consider that low IQ as a mitigating circumstance?

"A. No. Just because a person doesn't have a high IQ doesn't mean that they're supposed to go out and do the things, you know, to break the law. That's just not right. I'm sorry, that's the way I feel.

"Q. So I guess what your basically saying is that you could not consider that when you were—when you would be asked to answer these questions?

"A. A low IQ?

"Mr. Strother: Your Honor, I'm going to object to that. They first of all tried to get her to say that that would be mitigating evidence—

"The Court: Sustained."

Veniremember Walts stated she could consider all the evidence when answering the special issues. A veniremember is not subject to a challenge for cause because she will not commit, during voir dire, to give specified weight to a particular item of evidence. *Allridge v. State*, 850 S.W.2d at 481–82; see *Cuevas v. State*, 742 S.W.2d at 346. The trial court did not abuse its discretion by overruling appellant's challenge for cause to veniremember Walts. Point of error eighteen is overruled.

In point of error nineteen, appellant asserts the trial court erroneously refused to dismiss veniremember Brian Eugene Chappel. The record reflects appellant did not exercise one of his remaining peremptory strikes on veniremember Chappel. *Harris v. State*, 790 S.W.2d at 581; *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex.Cr.App.1986), cert. denied, 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987); *Bell v. State*, 724 S.W.2d 780, 795 (Tex.Cr.App.1986), cert. denied 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). Furthermore, the record reflects, after appellant's challenge for cause was overruled, appellant accepted veniremember Chappel. Therefore, error is not preserved for our review. See *Harris v. State*, 790 S.W.2d at 582. Appellant's nineteenth point of error is overruled.

In point of error twenty, appellant contends the trial court erred in rejecting his challenge for cause to veniremember Mary Ester Fraga. During questioning by appel-

lant, Fraga testified she did not believe appellant's family background and good conduct were relevant in answering special issue two. On questioning by the prosecutor, she said she could consider all mitigating evidence introduced by appellant when answering the three special issues:

"Q. The law says that you can look at all that evidence in answering those special issues one and two. If the defense brought you evidence that you thought for whatever reason about the way the defendant grew up or about his background or anything that you thought he wasn't going to be dangerous in the future, could you consider that in answering special issue number two, the future dangerousness issue?

"A. If I thought he was going to be dangerous?

"Q. From what the defense brought you, the evidence. Could you consider all the evidence that you heard in answering that question?

"A. Yes.

"Q. Okay. And if you thought from whatever evidence you heard about the defendant's background or past and all, if you thought the answer was no, would you consider that?

"A. I would think so.

"Q. For instance, suppose they brought you evidence that he had a real low IQ., you know, was just, you know, barely competent.

"A. Uh-huh.

"Q. And you thought that evidence showed that for whatever reason he wouldn't be a danger and the answer ought to be no, could you answer it no?

"A. Yes.

"Q. Okay. So you could consider all the evidence that you heard, is that right?

"A. Yes.

"Q. You would give it whatever weight you thought it was entitled to, is that right?

"A. Yes.

"Mr. Long: We believe she's qualified, Your Honor.

"The Court: Are you saying that you could look at the evidence, even if there was evidence of a low IQ. or evidence of how he grew up or how he kept his cell, that you could look at that evidence and then evaluate that evidence in answering the special issues that's submitted to you, specifically special number two, whether you thought he would constitute a continuing threat to society?

"A. I think so.

"The Court: All right. Overruled."

Veniremember Fraga is not required to give a particular variety of mitigating evidence any consideration. *Allridge v. State,* 850 S.W.2d at 482; see *Cuevas v. State,* 742 S.W.2d at 346. On this record, we cannot say the trial court abused its discretion in overruling appellant's challenge for cause to veniremember Fraga. Point of error twenty is overruled.

In point of error twenty-one, appellant contends the trial court erroneously refused to dismiss veniremember Victor Jeffress. The record reflects appellant did not exercise one of his remaining peremptory strikes on veniremember Jeffress. *Harris v. State,* supra; *Demouchette v. State,* supra. Furthermore, the record reflects, after appellant's challenge for cause was overruled, appellant accepted veniremember Jeffress as a juror. Therefore, error is not preserved for review, and point of error twenty-one is overruled.

In his twenty-third point of error, appellant asserts the trial court erred in refusing to grant his motion challenging the composition of the petit jury because the jury pool from which it was drawn was unconstitutionally composed. Appellant claims hispanics, blacks, persons older than sixty-five, and persons between the ages of twenty and twenty-five were underrepresented in the jury pool. However, appellant has not shown that State officials intentionally discriminated against these groups in calling people for jury duty. See *DeBlanc v. State,* 799 S.W.2d 701, 708 (Tex.Cr.App.1990); *Ex parte Wat-*

*son,* 606 S.W.2d 902, 904. Appellant's twenty-third point of error is overruled.

■ In point of· error number twenty-four, appellant contends the trial court erred in refusing to authorize the expenditure of money to finance appellant's efforts to develop evidence to support his claim the jury pool was not a "fair cross section of society." Under Article 26.05, V.A.C.C.P., it is within the discretion of the trial court to appoint, at taxpayer's expense, experts. Appellant sought to expend county funds in the amount of $165,270. There is no evidence he intended to use this money to establish systematic discrimination by State officials. See *Ex parte Watson,* 606 S.W.2d at 904. It was within the trial court's discretion to conclude expenditures of these sums would have been a waste of taxpayer's money. See *Day v. State,* 704 S.W.2d 438, 440–41 (Tex.Cr.App. 1986); *Lackey v. State,* 638 S.W.2d 439, 441 (Tex.Cr.App.1982); *Myre v. State,* 545 S.W.2d 820, 826 (Tex.Cr.App.1977). Point of error twenty-four is overruled.

In point of error twenty-two, appellant asserts the trial court erred by refusing to inform the jury of the result of its failure to agree on the special issues. This argument has been considered and rejected by this Court. *Davis v. State,* 782 S.W.2d 211, 221 (Tex.Cr.App.1989). Point of error twenty-two is overruled.

■ In point of error one, appellant contends the instructions given to the jury at the punishment phase of trial prevented the jury from "giving full effect to mitigating evidence...." *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The trial court's instruction regarding mitigating evidence stated:

"... If you find that there are any mitigating circumstances in this case you must decide how much weight they deserve, and thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response to the personal culpability of the defendant, then a negative finding should be given to one or more of the special issues under consideration."

This instruction complies with *Penry v. Lynaugh* and it allowed the jury to give "full" effect to appellant's mitigating evidence. See *Fuller v. State,* 827 S.W.2d 919, 936–37 (Tex.Cr.App.1992); *Moody v. State,* 827 S.W.2d 875, 897 (Tex.Cr.App.1992); *Lackey v. State,* 819 S.W.2d 111, 134 (Tex.Cr. App.1991); *Gribble v. State,* 808 S.W.2d 65, 75–76 (Tex.Cr.App.1990). Point of error one is overruled.

■ In point of error two appellant contends the definition of mitigating evidence given by the trial court was ambiguous and vague. The record reflect the trial court submitted the following definition in the charge:

"A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case."

Appellant has not shown how the charge is ambiguous and vague, and given the charge as a whole and the evidence, we find no error. See *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Cr.App.1985). Point of error two is overruled.

■ In point of error three, appellant argues the jury charge erroneously required the jury to be unanimous in finding mitigating circumstances. Specifically, appellant contends it was error to use the indefinite "you" in the following sentence: "If *you* find that there are any mitigating circumstances in this case, *you* must decide how much weight they deserve." (Emphasis added). The trial court's charge complies with *Penry v. Lynaugh* and it allowed the jury to give "full" effect to appellant's mitigating evidence. *Penry v. Lynaugh,* supra; *Moody v. State,* 827 S.W.2d at 897; *Lackey v. State,* 819 S.W.2d at 134; *Gribble v. State,* 808 S.W.2d at 75–76. Given the charge as a whole and the evidence, we find no error. See *Almanza v. State,* supra. Point of error three is overruled.

In point of error four, appellant asserts the instructions limited the jury's consideration of mitigating evidence to the facts which constituted the circumstances of the offense and the culpability of appellant. We find the language in the instructions are consistent with the requirements of *Penry*. *Penry v. Lynaugh,* supra. The specific language in the jury charge stated:

"You are therefore instructed that your answers to the special issues, which determine the punishment to be assessed defendant by the Court should be reflective of your finding as to the personal culpability of the defendant, Clydell Coleman in this case.

"If you find that there are any mitigating circumstances in this case you must decide how much weight they deserve, and thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue."

The jury charge provided a vehicle for the jury to give full effect to any mitigating evidence presented by appellant, *Moody v. State,* supra; *Lackey v. State,* supra, and appellant has not shown any error in the jury charge. *Almanza v. State,* supra. Point of error four is overruled.

In his fifth point of error, appellant asserts the trial court erred by refusing appellant's request for an additional special issue. Appellant's requested issue states:

"After considering all the relevant mitigating evidence, and after considering the defendant's personal as well as moral culpability, we find the defendant should be sentenced as follows:

"___ Life in the Texas Department of Corrections

"___ Death by lethal injection"

The actual charge given to the jury conveyed the same instructions and allowed for the same possible sentences as the issue submitted by appellant and therefore, appellant has shown no error. See *Moody v. State,* 827 S.W.2d at 895–97; *Almanza v. State,* supra. Point of error five is overruled.

In point of error twenty-six, appellant contends the state made improper jury arguments. Appellant complains of the following arguments the prosecutor made at closing:

"Mr. Strother: They want to talk about figures, well Buddy, are we going to talk about figures ... Here is what they have led you into thinking. These figures, people that were sentenced to capital murder and either got the death penalty, and got it commuted to life, or they got a life sentence in the first place. How do you even know where they are now. We know where they are not because they did no spend the rest of their life in prison, like they want you to think he is going to do.

"Defense: I object to that. That is an improper argument, you Honor. That suggests to them that he is going to get out at some point in time.

"Court: I sustain the objection, and instruct the jury they will not consider the last statement of Counsel for any purpose whatsoever.

"Defense: Move for a mistrial.

"Court: Overrule the motion.

"Mr. Strother: Everyone of these people, Dr. Markwardt, or whatever his name is talked to you about, are people that had the death penalty or got life, and they got out here on the outside, and they were dangerous again, and they came back into the system. They want you to think that society is nothing but prison society, and we talked a lot about that when we were picking this jury. Society is all of us. Don't fall for that rat, or go down that swamp, or rabbit trail. They have told you that the only society you can consider is prison society, and it just isn't that way.

"Mr. Reaves: I am going to object to that, that's a misstatement of the law. The society they are considering is prison society.

"The Court: Overruled.

"Mr. Strother: That's a misstatement of the law, your Honor.

"The Court: Overrule the objection, and instruct the jury, they will recall and follow the Court's Charge....

"Mr. Strother: How in the world did Dr. Markwardt ever get these figures in the

first place. It was people who had gotten a life sentence, and went out and broke the law again, and got caught. *Of course, he doesn't know how many people got a capital murder conviction, he didn't tell you about that, and got a life sentence, that are still out here, roaming the streets. His study isn't complete. It isn't complete, and it will never be complete until these people either get back in prison for breaking the law again, or being a threat somehow. How many of them are out here doing what Clydell Coleman had done for years, and get away with criminal acts ... If they get away with things out here, and don't get caught, we don't know about it. Those figures are absolutely meaningless, absolutely meaningless....*"

■ Appellant contends the prosecutor's jury argument was an improper reference to the parole laws [3]. Proper jury argument must fall within one of four categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, and (4) pleas for law enforcement. *Jacobs v. State*, 787 S.W.2d 397, 406 (Tex.Cr.App.1990).

■ At the punishment phase, appellant presented the testimony of a psychologist, Dr. Markwardt, on the difficulty of predicting future dangerousness. Dr. Markwardt testified about his research on a large number of people who received death sentences over a period of several years but whose sentences were overturned. His research group also included a large number of people who were convicted of capital murder and received life sentences over the same period of time. Dr. Markwardt testified that based on a number of factors his research showed most of those persons with death penalties were not dangerous in "prison society" and they were no more dangerous than those who received life sentences. Another witness later testified that serious violence is well controlled in prison.

Dr. Markwardt also testified a small number of his research group receiving the death penalty had been released without incident or being rearrested. On cross-examination, he testified these people could be committing violent crimes and not getting caught. He also testified his research is incomplete because most of the people in his research group are still alive. Based on appellant's records from the previous four times he went to prison, Dr. Markwardt testified appellant, if sentenced to life, would be a good inmate in prison society because he knows how to do his time.

Prior to the State's arguments set out above, appellant argued to the jury he was not dangerous when he was in prison four other times. He also argued the jury should return a "no" answer to special issue two because appellant would go to prison for the rest of his life and present no danger to "prison society." Furthermore, appellant presented expert testimony in support of his theory that he would present no danger to "prison society." The State's argument was a reasonable summation of, and a reasonable deduction from, the evidence, and a proper response to arguments of opposing counsel. In addition, the trial court's instruction to disregard the State's argument concerning the possibility appellant would get out of prison was sufficient to cure any error. See *White v. State*, 629 S.W.2d 701, 707–08 (Tex. Cr.App.1981) (the mere mention the defendant may be released on parole is not a denial of a fair and impartial trial on the issue of punishment). Point of error twenty-six is overruled.

■ In point of error twenty-five, appellant contends one of the State's witnesses committed perjury. The State presented Robert King during the punishment phase of appellant's trial. King had been incarcerated in the Texas Department of Corrections, now the Texas Department of Criminal Justice, Institutional Division. King testified at the time of his incarceration he had an altercation with appellant. On cross-examination,

---

**3.** *Within point of error number twenty-six, appellant urges the trial court should have defined the term "society" in the second special issue as "prison society." Article 37.071(b)(2), V.A.C.C.P. We have held the term "society"* under Article 37.071, Section (b)(2) need not be defined. *Caldwell v. State*, 818 S.W.2d 790, 798–99 (Tex.Cr.App.1991); See also *King v. State*, 553 S.W.2d 105, 107 (Tex.Cr.App.1977).

King testified he had "about three" felony convictions and he "had a few fights" while incarcerated. On motion for new trial, appellant established King had been convicted of seven felonies and accumulated ten recorded instances of misconduct while incarcerated. Appellant asserts his conviction should be set aside because King committed perjury.[4] However, we conclude King's ambiguous testimony was not perjury.

Even if King's testimony constituted perjury, any error in admitting the testimony was harmless. *Harris v. State,* 790 S.W.2d 568, 588 (Tex.Cr.App.1989). Had the jury known King was a seven-time convicted felon rather that a three-time convicted felon, the effect on the jury would have been the same. Point of error twenty-five is overruled.

■ In appellant's second supplemental point of error, appellant contends the trial court erred in granting the State's challenge for cause against veniremember Yolanda Rodriguez. The trial court granted the State's challenge to Rodriguez because she would hold the State to a higher burden of proof than beyond a reasonable doubt. Veniremember Rodriguez's testimony follows:

"Q. All right. Let me ask you this. The State has to prove beyond a reasonable doubt that the defendant is both guilty and that there is a probability that he would commit other acts of violence in the future to get a yes—if you'll look at special issue number two there that we've got up there. That says whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Now we have to prove that to you beyond a reasonable doubt. But beyond a reasonable doubt is not beyond all doubt, you know, a 100 percent certainty. It's just beyond a reasonable doubt.

"A. Uh-huh.

"Q. Now let me ask you this. To answer special issue number two yes, would we—would the State have to prove that to you beyond all doubt, beyond any doubt in your mind that he would commit criminal acts of violence in the future to answer it yes?

"A. Yes.

"Q. You believe we would have to prove that beyond all doubt to you, right, feeling as you do about assessing the death penalty?

"A. Uh-huh.

"Q. Okay. Could you not use the reasonable doubt standard, but instead you'd have to say, you know, the State proved this to me beyond all doubt, I've just got to be 100 percent certain?

"A. Yeah, I'd have to be 100 percent.

"Q. Okay, just absolutely—

"A. Yes.

"Q. 100 percent certain in order to assess the death penalty. That's fine. See, my mother couldn't have assessed it period, you know, at all.

"A. Yeah.

"Q. You say that you would have to be absolutely 100 Percent certain.

"A. Uh-huh.

"Q. And further, do you feel like that you couldn't follow the law about just having to have those special issues proved to you beyond a reasonable doubt, but rather that you would have to have it proved to you to absolute a hundred percent certainty that he would commit criminal acts of violence in the future before you could answer those questions yes?

"A. Yes.

"Q. Okay. All right, are you saying "yes, I could follow the law," or I've got reasonable doubt, or "no, I'd have to have it proved to me to a hundred percent certainty?"

"A. I'd have to have it proven to a hundred percent. No.

---

4. Appellant does not contend the State knew King had seven felony convictions when he testi- fied on cross-examination.

"Q. Okay. Let me ask you, there's a real question in your mind, isn't it, whether you could ever assess the death penalty in any case, is that correct?

"A. Uh-huh. I don't think I could."

The State challenged the juror for cause and then the defense questioned the juror:

"Q. Okay. The real question is would you—do you understand what beyond a reasonable doubt is?

"A. Yes.

"Q. It's not beyond all doubt whatsoever, but it's something that's up to you, okay? If you have some doubt and you consider that doubt to be a reasonable one, then obviously the State hasn't proven their case to you.

"A. Uh-huh.

"Q. Okay. The question is could you just—could you hold the State to their burden and just require them to prove their case to you beyond a reasonable doubt?

"A. Uh-huh.

"Q. Okay. You would require them to do something more?

"A. No, I would just—I'll say yeah.

"Q. Okay. You could live with that if you were convinced in your mind that they proved to you that the defendant was guilty of capital murder, you were convinced beyond a reasonable doubt you could bring back a verdict of guilty.

"A. No. I don't know.

"The Court: What was your answer, ma'am?

"Court Reporter: No.

"A. No.

"Mr. Strother: Your Honor, we would reassert our challenge for cause. She said she couldn't return a verdict of guilty based on a reasonable doubt.

"The Court: Ma'am, I'm going to grant the State's challenge for cause. You'll be excused."

Relying on *Garrett v. State,* 851 S.W.2d 853, 860 (Tex.Cr.App.1993), appellant claims the trial court erroneously granted the State's challenge for cause. In *Garrett,* this Court held a veniremember is not subject to challenge for cause simply because the veniremember would set his reasonable doubt threshold higher than the legal minimum in order to affirmatively answer special issue two. *Id.* at 860. *Garrett* is clearly distinguishable because the trial court was entitled to find Rodriguez would not find appellant guilty even if the State proved its case beyond a reasonable doubt. *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Cr.App.1992). The State may properly challenge a juror for cause when the juror would hold the State to a higher standard than beyond a reasonable doubt. *Allridge v. State,* 850 S.W.2d at 478; *Cantu v. State,* 842 S.W.2d at 682; *Jacobs v. State,* 787 S.W.2d at 404; *Jackson v. State,* 745 S.W.2d 4, 16 (Tex.Cr.App.1988). The trial court properly excused veniremember Rodriguez for cause and appellant's second supplemental point of error is overruled.

The trial court's judgment is affirmed.

CLINTON, J., dissents.