

## IN THE
## TENTH COURT OF APPEALS

_____

### No. 10-13-00431-CR
### No. 10-13-00432-CR

**EMILIO MARTINEZ,**

                                                                        **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                                        **Appellee**

_____

### From the 13th District Court
### Navarro County, Texas
### Trial Court Nos. C34602-CR and C34603-CR

_____

## MEMORANDUM  OPINION

_____

A jury found Appellant Emilio Martinez guilty of resisting arrest with a deadly weapon and evading arrest/detention with a vehicle and assessed his punishment at ten years' and three years' imprisonment, respectively.  These appeals ensued.

**Commitment Questions During Voir Dire Examination**

In his first issue in each appeal, Martinez contends that the trial court erred in overruling his objections to improper commitment questions propounded by the State

during voir dire.

The following exchange took place during the voir dire examination:

[Prosecutor]: ….
Okay. Ms. Fox, the same question to you. If all the other evidence in the case - - you heard from different witnesses and everything else made you completely comfortable, in your heart, beyond a reasonable doubt that defendant was guilty, but there was a video that got lost, would you still be able to convict that person?

[Defense Counsel]: Your Honor, I would object at this time to an improper commitment question.

….

(At the Bench, on the record)

….

THE COURT: Your question is: If you find we've proven our case beyond a reasonable doubt - - that's how you start your question?

[Prosecutor]: Yes. Yes, Your Honor. If we - - if you find that we've proven to you in the elements beyond a reasonable doubt but there's not a video, would you still be able to convict?

THE COURT: Okay. I'll allow that question. Your objection's noted.

(Attorneys return to their table)

….

[Prosecutor]: Okay. Back to you, Ms. Fox. Same question. If the State put on evidence that proved to you beyond a reasonable doubt that the defendant was guilty of the crimes that were charged but there was not a video, would you still be able to convict him?

….

[Defense Counsel]: I would just renew my objection to improper questioning of the jury panel. Is my objection overruled?

THE COURT:  Yes.

….

[Prosecutor]:  Okay.  I'm going to give you a fun fact pattern. Okay.  Let's imagine for a minute that there actually was a murder that was caught on tape.  It happened in this mythical ball that we've been talking about already.  Someone gets gunned down in the Walmart parking lot, shot three times in the chest.  The video the people have seen before  - - including Walmart, including the police   - -   shows somebody, the defendant, shooting that person three different times.  They fall over dead.

Walmart's system, for whatever reason, rolls over that video and it goes away.   There was one copy with the Police Department. Somebody lost it  - - oops.  But you have a whole bunch of people in that Walmart parking lot.  You have a whole bunch of officers that saw it.  You have employees that saw it.  Can you not envision a case where if we prove to you beyond a reasonable doubt the elements, that you'd be able to convict even without a video.

[Defense Counsel]:  Your Honor, again, I would re-urge my objection to an improper commitment question.

[Prosecutor]:  Your Honor, it's a hypothetical.

THE COURT:  Your objection's overruled.

….

[Prosecutor]:  Jury never saw [the video].  You never saw [the video].  But you believe in your heart  - -  you believe from all these other witnesses beyond a reasonable doubt this person killed him, would you let him off?

….

[Prosecutor]:  Okay, all right.  All right.  Keeping the worst case scenario in mind here, now, is there anyone in the first row that would - - even if we proved to you the case beyond a reasonable doubt  - -  you believed beyond a reasonable doubt the defendant was guilty, you would not be able to convict them if there was not a video?
…. Anybody on the second row  - -  anybody at all?  ….

....

[Prosecutor]: Okay, all right. Is there anybody on the third row that wouldn't be able to convict even though we've presented you with evidence beyond a reasonable doubt? Anybody on the third row? Anybody on the fourth row? Anybody on the fifth row?

....

Anybody else on the fifth row? .... Anybody on the sixth row? Anybody on the left side of the room? .... Anybody else?

....

[Defense Counsel]: Hold on just one second. Your Honor, may I - - just to make sure my objection is properly stated. I'm also relying on the case of Stanford [*sic*] v. Texas in my objection here under improper commitment question. May that also be noted?

THE COURT: Yes, sir.

[Defense Counsel]: Thank you. My objection is still overruled?

THE COURT: Yes, sir.

In *Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001), the Court of Criminal Appeals articulated a test for determining when a voir-dire question calls for an improper commitment. The test has two steps: (1) Is the question a commitment question, and (2) Does the question include only those facts that lead to a valid challenge for cause? *Id.* at 182. If the answer to the first question is "yes" and the answer to the second question is "no," then the question asked is an improper commitment question. *Id.* at 182-83.

The State does not dispute, and we agree, that the prosecutor's questions were commitment questions. *See Lydia v. State*, 109 S.W.3d 495, 498 (Tex. Crim. App. 2003) ("Commitment questions 'commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact.'") (quoting *Standefer*, 59

S.W.3d at 179).  The issue is whether the commitment questions were proper or improper.

> A commitment question can be proper or improper, depending on whether the question leads to a valid challenge for cause.  [*Standefer*, 59 S.W.3d] at 181.  Commitment questions are improper when (1) the law does not require a commitment or (2) when the question adds facts beyond those necessary to establish a challenge for cause.  *Id.* at 181-182.

*Lydia*, 109 S.W.3d at 498.

The State may properly challenge a prospective juror for cause when the juror would hold the State to a higher standard than beyond a reasonable doubt.  *Coleman v. State*, 881 S.W.2d 344, 360 (Tex. Crim. App. 1994).  While it is true that a juror may set his or her threshold for determining the requirement for attaining the "beyond a reasonable doubt" standard higher than the legal minimum, a juror may be challenged if he or she would require a higher standard than "beyond a reasonable doubt."  *Id.*  Here, the questions asked if the jurors would require specific evidence (a video) even if they believed the State had proven its entire case beyond a reasonable doubt.  The questions contained facts, and nothing additional, that if answered affirmatively would authorize a challenge for cause.  Therefore, the questions were not improper commitment questions.  *See Acree v. State*, No. 06-08-00003-CR, 2008 WL 3876563, at *4 (Tex. App.— Texarkana Aug. 22, 2008, no pet.) (mem. op., not designated for publication) (holding question was not improper commitment question where it asked if jurors would require DNA testing even if they believed State had proven its entire case beyond a reasonable doubt).  Accordingly, Martinez's first issues are overruled.

## Sufficiency of Evidence

In his second issue in each appeal, Martinez contends that the trial court erred in

denying his motion for a judgment of acquittal and directed verdict, which is also a challenge to the sufficiency of the evidence to support the conviction. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996). More specifically, Martinez argues in both cases: "The evidence adduced in the State's case in chief was legally insufficient to negate the defenses of self-defense and necessity raised by the Defense."[1]

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none

---

[1] The trial court did not give a self-defense instruction in either case, but we measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). As explained below, we believe that the trial court erred in denying Martinez's request for a self-defense instruction in the resisting-arrest charge.

of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A defendant has the burden of producing some evidence to support a claim of self-defense or necessity. *See* TEX. PENAL CODE ANN. §§ 2.03, 9.02, 9.22, 9.31 (West 2011); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). After the defendant has introduced some evidence of a defense, the State bears the burden of persuasion to disprove it. *Zuliani*, 97 S.W.3d at 594. This burden does not require the State to produce evidence disproving the defense; it requires only that the State prove its case beyond a reasonable doubt. *Id*.

A person commits the offense of resisting arrest if "he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest … of the actor or another by using force against the peace officer or another." TEX. PENAL CODE ANN. § 38.03(a) (West 2011). The offense is elevated from a Class A misdemeanor to a third-degree felony if "the actor uses a deadly weapon to resist the arrest or search." *Id.* § 38.03(c), (d). A person commits the offense of evading arrest or detention if "he intentionally flees from a person he knows is a peace officer … attempting lawfully to arrest or detain him." *Id.* § 38.04(a) (West Supp. 2014).

"[A] person is justified in using force [self-defense] against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*. § 9.31(a). Section 9.31(b)(2) of the Penal Code states, however, that use of force against another is not

justified "to resist an arrest or search that the actor knows is being made by a peace officer, or by a person acting in a peace officer's presence and at his direction, even though the arrest or search is unlawful, unless the resistance is justified under Subsection (c)."  *Id.* § 9.31(b)(2).  Subsection (c) states that the use of force to resist an arrest or search is justified:

> (1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and

> (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.

*Id.* § 9.31(c).  Subsection (d) also states that the use of deadly force is warranted if a person is justified in using force under section 9.31 and when and to the degree the person reasonably believes the deadly force is immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force.  *Id.* §§ 9.31(d), 9.32(a).

> Conduct is justified as necessity if:

> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

> (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

*Id.* § 9.22.

The evidence presented in this case was as follows:  On July 1, 2012, uniformed police officer Eric Hielman was patrolling in southeast Kerens in a marked police car when he noticed a pickup truck that he had never seen before in that neighborhood.

Officer Hielman testified that he began following the truck and saw it roll through three stop signs in a row; therefore, he pulled the truck over for the traffic violations. He approached the truck's driver, later identified as Martinez, and asked him to produce his driver's license. Martinez replied that he did not have one. Officer Hielman stated that it seemed like Martinez was trying to hide his hands or that he was doing something with his hands behind the truck door. Officer Hielman thus leaned over so that he was able to see Martinez's hands. Officer Hielman saw that Martinez had a knife "like a pocket knife" in his hands; Officer Hielman did not see the blade of the knife. Officer Hielman stated that he stepped back one or two steps, put his hand over his gun, and asked Martinez what he was doing with the knife. Martinez replied, "Nothing." Officer Hielman then twice told Martinez that he needed to put the knife down, but Martinez did not comply. Officer Hielman said that he then pulled his gun out for his own safety. He never pointed it at Martinez; he had it directed downward and "at the ready." Officer Hielman stated that Martinez laughed at him and said, "What are you going to do, shoot me?" Martinez then rolled up his window and "sped off" in a cloud of dust.

Officer Hielman testified that he re-holstered his gun, went back to his car, and followed in the direction Martinez had gone. After a couple of blocks, he saw Martinez's truck parked in the driveway of a house, so he pulled up perpendicularly to the truck to try to block it in. He was about to get out of his car when Martinez came out of the door of the home with what appeared to be a shotgun or rifle. Officer Hielman felt threatened and backed up his car to the intersection to be a safe distance away and to block off the road. Officer Hielman then got out his own shotgun, got behind his car for cover, and

called for assistance while Martinez continued pacing between the truck and the house. Backup began to arrive, including SWAT officers. Officer Hielman was not involved in eventually restraining Martinez, but he heard Martinez being told to put the gun down and then saw several people on top of Martinez trying to restrain him. A gun and a knife were collected at the scene.

Kerens Police Sergeant Roy Ivey testified that he was not on duty that evening but was called and informed that Officer Hielman was being held at gunpoint. He immediately grabbed his duty weapon and drove to the scene in his patrol car. When he arrived, he parked his car so that it blocked another intersection more than a block away from the house. He then walked toward the house. He could not see Martinez from his position, but he did hear Navarro County Sheriff Elmer Tanner[2] talking in a conversational tone to someone. After a time, he heard Sheriff Tanner loudly say, "You're acting foolish now" or "You're acting dumb," and he could tell that someone was running towards the house. He ran to assist. He saw Martinez lying on the ground with a gun underneath him and several officers on top of Martinez trying to get him to let go of the gun. Sergeant Ivey joined in the struggle because Martinez was resisting. He could hear officers saying, "Let go of the gun." The officers eventually removed the gun from Martinez, and Martinez was placed into custody.

Navarro County Sheriff's Captain and SWAT team member Hank Bailey testified that dispatch called him that evening and told him to respond to the scene. When he

---

[2] At the time of this incident in July 2012, Sheriff Tanner was the Captain of the Navarro County Sheriff's Department's Criminal Investigation Division and Narcotics and also the Captain of the Navarro County Sheriff's Department's SWAT team.

arrived, he relieved a Kerens police officer who had taken position behind a tree at the residence next door to Martinez's location. He heard Sheriff Tanner identify himself and begin talking with someone. He then saw Sheriff Tanner move into Martinez's driveway. Sheriff Tanner had put away his weapon; it was on his hip, but Navarro County Sheriff's Captain and SWAT team member Darrell Waller was near Sheriff Tanner behind the trees at the corner of a fence. Captain Bailey heard Sheriff Tanner tell Martinez that he needed to give himself up. After more conversation between Sheriff Tanner and Martinez, Captain Bailey heard Sheriff Tanner say something like, "Don't do that," and then Sheriff Tanner moved toward Martinez. Captain Bailey "took off" toward them because he knew that Martinez either had a gun or had taken off running. Sheriff Tanner, Captain Waller, and Martinez were struggling for the gun at the tailgate of the truck. Captain Bailey joined the struggle by grabbing Martinez around the head and pulling him back. Captain Bailey hit Martinez in the body multiple times while they were trying to gain control of Martinez's gun and his arms and hands. They all ended up on the ground, and he and the other officers were screaming for Martinez to turn loose of the gun, but he would not. Martinez was physically fighting them the entire time. They eventually got the gun away from Martinez and handcuffed him.

Diane Noel testified that she was home on that evening when her roommate said that there was an officer parked outside of their home. She went outside and saw an officer standing behind his police car with his gun drawn. The officer asked her to go back inside her home, so she did. Once inside, she went to the other side of her house and saw that the officer was looking at her neighbor Martinez. Martinez was standing

inside his doorway. When her roommate said that Martinez had a gun, she looked and saw that Martinez did have a gun down beside him behind his back. Martinez then came outside with the gun and was behind the truck that was parked in the driveway. Noel stated that she called 9-1-1 because this was not normal behavior for Martinez and she was worried about someone getting hurt. More police arrived on the scene, including the SWAT team. An officer started talking to Martinez, and Martinez said that he really did not trust the officer, but Martinez finally laid the gun down in the back of the truck and walked to the back of the truck where the officer was. After a time, seven or eight officers came running at Martinez. It appeared that Martinez was moving back toward the house. They got on him and kicked and hit him a few times. At that point, her roommate screamed out, "That's enough. Stop it." Noel said that she never saw Martinez pick the gun back up after he laid it down but that she could not swear that Martinez did not have the gun when the officers rushed him.

Kerens Police Officer Don Covey testified that he was home that evening when he received a call from Kerens Chief of Police Bryan Miers telling him that Officer Hielman had a situation and he was needed. He responded to the scene and was positioned on the outside perimeter. When the tactical team finally took down Martinez, he saw several officers on top of Martinez struggling for a weapon. In the end, he collected a single-shot 20-gauge shotgun from Sheriff Tanner. When he secured the weapon, he found a live shell in the chamber. He also collected a live shell and a pocket knife that were found in Martinez's pocket when he was restrained.

Chief Miers testified that he received a call from dispatch that evening about the

standoff situation and immediately responded to the location. Once he learned from Officer Hielman where Martinez was, he used his binoculars to view the area and saw Martinez lying on the ground on his chest near or under the truck with a long gun pointed in the direction of the officers. Chief Miers kept his attention on Martinez, but at the same time, he set up an outer perimeter and established himself as the command post. He also made the decision to call the SWAT team. He remained at his command post for the majority of the standoff; however, when Sheriff Tanner began speaking to Martinez, he went around the house to "back cover" Sheriff Tanner and Captain Waller. He said that Sheriff Tanner identified himself to Martinez multiple times and told Martinez to "put the gun down" numerous times. Martinez did eventually put the gun down. Sheriff Tanner and Martinez then met face to face in Martinez's driveway. Sheriff Tanner was trying to explain to Martinez that everything was going to be okay but that they needed to ensure that Martinez was free of weapons. During that conversation, Martinez turned and ran back toward his house, grabbing his gun in the process. At that point, Sheriff Tanner, Captain Waller, Captain Bailey, Sergeant Ivey, and he began a short foot pursuit. There ended up being a huge struggle between the officers and Martinez to get the gun from Martinez's hands, and Martinez was ultimately detained.

Captain Waller testified that when he arrived, Sheriff Tanner was already there. Sheriff Tanner gave him a briefing, and then he and Sheriff Tanner decided to do "a recon" around the area so that they could identify where the Kerens police personnel were so that they could be replaced on the inner perimeter when the rest of the SWAT team arrived. Sheriff Tanner had night vision goggles, and Captain Waller had a rifle.

Captain Waller stated that they ended up between Martinez's house and the next door neighbor's house. They could not see Martinez, and a large group of pedestrians and civilians were walking around the neighborhood. The rest of the SWAT team had arrived a couple of blocks down the street, and one of the officers in charge of the SWAT team was telling people that they needed to get back and get into their houses. Captain Waller believes that this caught Martinez's attention because Martinez came up from behind the truck with the long gun. When Captain Waller saw the gun, he advised Sheriff Tanner of it. Sheriff Tanner and Captain Waller then identified themselves to Martinez as Navarro County Sheriff's Department and told him to put down the gun. Martinez backed up behind the truck's cab. Sheriff Tanner then began talking to Martinez, advising him of who he was and that Martinez needed to put down the weapon. Martinez was argumentative and refused to put down the weapon. Sheriff Tanner was eventually able to talk Martinez into laying the gun on the top edge of the bed of the truck. Sheriff Tanner then talked Martinez into walking out away from the truck a few feet to the edge of the driveway. Sheriff Tanner also left his cover and walked to the corner of the property while he was talking to Martinez.

Captain Waller testified that he decided to move toward Sheriff Tanner at that time because he could not cover him from his position and because they did not know whether Martinez had other weapons on him. When Captain Waller was moving, Martinez stopped mid-speech, looked at him, and said, "Who is he? What's he doing here?" Sheriff Tanner told Martinez that Captain Waller was there just to protect him and that he was part of Sheriff Tanner's team. Captain Waller's weapon was slung in a downward

position in front of him; he was not pointing it at Martinez. Martinez began looking around erratically, and Captain Waller knew that he was about to do something. Sheriff Tanner told Martinez, "Don't do it. Don't do it." Martinez stepped back and then took off for the shotgun. Sheriff Tanner grabbed Martinez, and Captain Waller followed. Martinez reached up and grabbed the shotgun with one hand just before both Sheriff Tanner and Captain Waller hit him and he fell into the truck. Sheriff Tanner grabbed the shotgun to try to hold Martinez and get control of the shotgun. Martinez was struggling, so Captain Waller then began giving "spear strikes" with his rifle to Martinez's rib cage to try to make him let go of the gun. Captain Waller struck Martinez at least four times as hard as he could. The goal was not to hurt Martinez but to get the shotgun from him. Several other officers showed up to help. Sheriff Tanner was finally able to pry the gun loose from Martinez's hand, and they were able to handcuff Martinez.

Sheriff Tanner testified that he received a phone call about the situation, changed into tactical clothing, and went directly to the command post at the scene. After getting a brief assessment from Chief Miers, he told Captain Waller that they would be going on a "scout" of the area because they needed to understand Martinez's location, move a team into place to relieve perimeter officers who did not have the proper protective safety equipment, and offer protection to other citizens in the area. He had no intention of engaging Martinez while conducting the scout.

Sheriff Tanner stated that he and Captain Waller ended up by a vehicle in the driveway of the residence next door to Martinez's location. Sheriff Tanner was using night vision goggles, and Captain Waller was covering him. They then started hearing

shouting from the perimeter officers, and he and Captain Waller saw Martinez "pop up" into their view with what appeared to be a long weapon in his hands pointed in the direction of the yelling. At that time, Sheriff Tanner and Captain Waller yelled, "Navarro County Sheriff's Office. Put the weapon down." Sheriff Tanner repeated the command numerous times, but Martinez repeatedly replied that he did not know who they were because he could not see them. Sheriff Tanner eventually told Martinez that he was not coming out unless Martinez put the weapon down, and Martinez laid the weapon on the bed rail of his truck. Sheriff Tanner continued to negotiate with Martinez, and they simultaneously began to move to the corner of the property. When he got close enough, Sheriff Tanner identified himself as being with the Navarro County Sheriff's Office and shook Martinez's hand. At some point, Sheriff Tanner asked Martinez to raise his shirt and turn around, and Martinez complied. Sheriff Tanner tried to discreetly move so that he was positioned between Martinez and the truck because that is where the gun was located, and Captain Waller moved up from his position at the neighbor's truck. All of a sudden, Martinez said, "Who is that?" and pointed in the direction of Captain Waller. Sheriff Tanner tried to assure Martinez that it was "one of my guys" and that it was "all right," but Martinez immediately started to run back toward the truck. Knowing that the gun was on the truck, Sheriff Tanner grabbed Martinez, but Martinez dragged Sheriff Tanner with him. Within a few seconds, Captain Waller was also trying to restrain Martinez, but Martinez had made it all the way back to the truck and had grabbed the gun with his right hand. Martinez made a sweeping motion with the weapon. About that time, Captain Bailey was also getting there. Sheriff Tanner said, "I have the gun.

Concentrate on him." He meant that he was dedicating himself to trying to take control of the gun and to preventing Martinez from doing anything else with it. During the struggle, the gun was not cocked, which would have been required to fire the weapon, but Martinez was definitely fighting back and trying to maintain control of the gun. Other officers also came in to try to help take the weapon from Martinez. Martinez was eventually placed on the ground, and the weapon was taken from him and secured.

Janet Brown, Noel's roommate, testified that she walked outside that evening and saw a Kerens police officer parked across the road with his gun across the top of his car pointed towards Martinez's house. Martinez's truck was in the driveway. Martinez stood in the doorway of the house "on and off," and she and Noel realized that he had a gun beside him. He would also come outside, just stand there, and look around. No one was talking to Martinez at that time. It was dark when the SWAT officer approached him. The officer told Martinez that he wanted to talk to him, but Martinez said that he was not going to talk to him because he had guns. Martinez also said that he was not putting down his gun when they had guns pointed at him. The officer told Martinez to put down his gun and said that he would put down his own gun so that they could have a discussion and work it out. Martinez left his gun and came around the truck, and the officer approached Martinez. The officer patted down Martinez, and then they were talking when another officer started to walk up. When the other officer approached, Martinez backed up a little and said, "The guns - - the guns. You told me nobody's going to have these guns. We're going to talk." Martinez also said, "No, no. This is wrong. This is wrong." Martinez then turned, and an officer screamed, "He's going to

run." Brown said that Martinez did not run, but the officers grabbed him there at the back of the truck, and Brown could hear the officers hitting Martinez. She screamed out the window on three separate occasions for them to stop. She never saw the gun leave the truck after Martinez had put it down there.

Finally, Martinez testified that he was stopped by Officer Hielman about four blocks from his house. He had not run any stop signs, and he did not know why he was pulled over. Officer Hielman got out of his patrol car, walked up to his car, and asked him for his license, insurance, and registration. Martinez responded that he did not have his license with him. Martinez also told Officer Hielman that he had just gone out for a brief second, that the insurance was good on the truck, and that it was his boss's truck. Officer Hielman then told Martinez that he needed him to turn off the truck and step out of the vehicle. Martinez testified that this made him feel awkward because it was different from his experience of being stopped in Kerens.

Martinez said that he tried to explain to Officer Hielman that if he turned off the truck, it might not turn back on, but Officer Hielman nevertheless told Martinez, "Turn off the truck and step out." Martinez said that he would, but then he looked down and remembered that his knife was in his lap. He had just bought the knife at the flea market and had been showing it to his friends. Martinez testified that he did not want the knife to fall onto the ground when he stepped out of the truck because "that looks bad," so he picked up the knife and was going to put it in the console. Officer Hielman put his hand on his holster and said, "What are you doing with that knife?" Martinez responded, "Nothing." Officer Hielman got very angry and kept telling Martinez to get out of the

truck.  Martinez asked Officer Hielman what he was going to do with the gun.  Officer Hielman had then gotten his gun out and was pointing it down at an angle.  Martinez then asked Officer Hielman something like, "What are you going to do, shoot me?"  Martinez testified that he was trying to get other people to come out of their houses and see what was going on.  Officer Hielman then pointed the gun very closely to Martinez's face.  Martinez stated that he could see down the barrel of the gun and got scared.  It seemed like Officer Hielman was trying to squeeze the trigger but the safety was on.  Martinez then rolled up the window slightly and sped away.  Martinez testified that he had felt that leaving was immediately necessary to not get shot.  Once Martinez was out of shooting range, he was a block and a half away from his house, so he went on to his house, pulled into the driveway, and parked the truck.

Martinez testified that he went into the house.  He looked out the window and saw Officer Hielman parking his car at the intersection.  Martinez stated that he thought the officer would have come up to his house but that he did not.  Martinez thought that if Officer Hielman had something personal against him, then he should arm himself until someone else showed up.  Martinez does not own a firearm, but his father does, and Martinez found a shotgun and two shells.  Martinez saw through the window that the officer was still there.  Martinez walked outside with the shotgun.  He was not waving it around or aiming it at anyone; he just felt safer with it.  Martinez got behind the truck and saw another squad car pull up.  They were watching him, but they did not try to talk to him.  When it got dark, the SWAT team arrived.  He testified that he thought it was weird and extreme.  Before talking to Sheriff Tanner, he had not spoken with any other

officers other than Officer Hielman.

Martinez testified that Sheriff Tanner was next door and told him that he just wanted to find out what was going on with him and Officer Hielman. Martinez replied that he did not know but that the officer had pointed a gun at him and he had to get away. Sheriff Tanner told him that he just wanted to talk and said something like, "If you put your gun down and talk to me, everybody can just go home about their business and resume their life." Martinez replied that he would put his weapon down and talk but asked if Sheriff Tanner would put his gun down too. Sheriff Tanner agreed, so Martinez laid his gun down on the bed of the truck. Martinez showed Sheriff Tanner his hands and then stepped out into the open. Sheriff Tanner asked Martinez to lift up his shirt and turn around, and Martinez complied. Sheriff Tanner then came out as well, and Martinez saw that he was not holding a firearm. Sheriff Tanner asked if he could pat down Martinez, and Martinez agreed. Sheriff Tanner asked if Martinez had any weapons on him, and Martinez explained that he had a pocket knife in his pocket. Sheriff Tanner reached into Martinez's pocket and removed the knife. Sheriff Tanner then introduced himself to Martinez.

Martinez and Sheriff Tanner were about to start talking when Martinez saw another officer in full body armor with his machine gun coming toward him. Martinez said that he thought they had agreed that they were going to talk without a bunch of guns. Martinez stepped back a little. The other officer then began hitting him and spearing him in the ribs with the gun. Martinez said that he thought that they were not there to arrest him anymore. After three strikes, Martinez broke free from the officer's

grasp, turned around, quickly ran back to where he had laid his shotgun, and grabbed it to get the officer to stop hitting him. Martinez thought Sheriff Tanner grabbed the shotgun and was trying to jerk it out of his hands. Many other officers then rushed him. They were hitting and punching him, and he held onto the gun "for dear life." One of the officers was choking him, and he started to black out when he decided to let go of the gun. When he let go of the gun, the officers let go of him. The officers then handcuffed him and took him to the Navarro County jail.

After viewing all the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of both resisting arrest with a deadly weapon and evading arrest/detention with a vehicle beyond a reasonable doubt and also could have found against Martinez on the self-defense and necessity issues beyond a reasonable doubt. Ultimately, the jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony and was free to believe or disbelieve the evidence proffered by Martinez regarding the issues of self-defense and necessity. We thus overrule Martinez's second issues.

**Motion for Mistrial**

In his third issue in each appeal, Martinez contends that the trial court erred in denying his motion for mistrial following the admission of extraneous-offense testimony that he was possibly on some sort of narcotic at the time of his apprehension.

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). An appellate court must uphold the trial court's ruling if it

was within the zone of reasonable disagreement. *Wead*, 129 S.W.3d at 129. A mistrial is required only in extreme circumstances where the prejudice is incurable. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins*, 135 S.W.3d at 77.

The exchange at issue occurred as follows:

> Q.     [By Prosecutor] Okay. And what was the suspect's demeanor during  - -  while he was having this conversation talking with Sheriff Tanner?
>
> A.     [By Captain Darrell Waller] My observation was that he was paranoid of the police. That he refused  - -  that he was non-cooperative.
>
> Q.     Okay.
>
> A.     Through my experience, at the time, I believed that he was possibly on some type of narcotic or had some type  - -
>
> [Defense Counsel]:     Your Honor, may be [*sic*] approach?
>
> A.     - - mental issue.
>
> THE COURT: You may.
>
> (At the Bench, on the record)
>
> ….
>
> (Jury exits courtroom)
>
> ….
>
> [Defense Counsel]: … I have an objection to any type of allusion to, "Well, I think he was high or he might've been smoking marijuana or wet." And that's  - -  and that's what happened. And that's what happened.

And so I guess, No. 1, I object to the non-responsiveness. No. 2, it's -- it's -- it is -- it is speculation. No. 3, it is irrelevant and it violates my -- my Motion in Limine.

….

THE COURT: So what exactly are you requesting?

[Defense Counsel]: Mistrial.

….

THE COURT: In regards to your request for Mistrial, that's denied.

[Defense Counsel]: Your Honor, then if the question is -- if -- if -- if that -- this statement is allowed to stand, then certainly, I would object to -- well, we're going to ask that the jury disregard the statement.

THE COURT: Okay.

….

[Defense Counsel]: I'd be satisfied with an instruction to disregard at this point.

THE COURT: Okay.

….

(Jury is seated in the courtroom)

THE COURT: You may be seated. Please let the record reflect that the jury is present and seated.

Ladies and gentleman, I am going to instruct you to disregard this witness's last statement.

You may proceed.

Testimony that refers to or implies extraneous offenses can be rendered harmless

by an instruction to disregard by the trial court, unless the evidence was so clearly

calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Harris v. State*, 164 S.W.3d 775, 783 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Martinez argues that Captain Waller's testimony was incurable because it was made "with calculated intent" to inflame and mislead the jury into believing he was a drug addict. But even if Captain Waller's testimony was intentional, it was not embellished in any manner. We conclude that the uninvited and unembellished reference to Martinez *possibly* being on some type of narcotic during the incident was not so inflammatory as to undermine the efficacy of the trial court's instruction to disregard. *See Kemp*, 846 S.W.2d at 308; *see also Thomas v. State*, No. 01-01-00127-CR, 2002 WL 501646, at *3 (Tex. App.—Houston [1st Dist.] Apr. 4, 2002, pet. ref'd) (holding that reference to appellant as "narcotics suspect," which was not repeated, was not so inflammatory as to undermine possible instruction to disregard). The trial court did not abuse its discretion in denying Martinez's motion for mistrial. We overrule Martinez's third issues.

## Self-Defense Instructions

In his fourth issue in each appeal, Martinez contends that the trial court erred in denying his request for an instruction on self-defense. Martinez actually only requested an instruction on self-defense as to the resisting-arrest charge; nevertheless, we will also address whether the trial court should have given an instruction on self-defense as to the evading-arrest/detention charge. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) ("The issue of error preservation is not relevant until harm is assessed.").

A claim of jury-charge error is reviewed using the procedure set out in *Almanza*. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The first step is to determine whether there is error in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Only if we find error, do we then analyze that error for harm. *Id.*

A trial court must give a requested instruction on every defensive issue raised by the evidence without regard to its source or strength, even if the evidence is contradicted or not credible. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). A defense is supported (or raised) by the evidence if there is *some* evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true. *Id.*

The State argues that Martinez was not entitled to self-defense instructions because Martinez did not admit to the underlying offenses.

> To rely on "self-defense," the defendant must first admit committing the conduct which forms the basis of the indictment; the defense is inconsistent with a denial of the conduct. *Kimbrough v. State*, 959 S.W.2d 634, 640 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd); *McDonald v. State*, 761 S.W.2d 56, 60 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). All statutory affirmative defenses "justify the defendant's admitted participation in the act itself." *Sanders v. State*, 707 S.W.2d 78, 81 (Tex. Crim. App. 1986). However, the Court of Criminal Appeals has explained that "admitting the conduct" does not always mean admitting the commission of every statutory element of the offense. For example, in *Martinez v. State*, the defendant was charged with murder. *Martinez v. State*, 775 S.W.2d 645, 645 (Tex. Crim. App. 1989). He admitted to pulling a gun, firing into the air, and having his finger on the trigger when the fatal shot was fired. *Id.* at 647. However, he denied the element of "intent to kill." *Id.* The Court held he had "sufficiently admit[ted] to the commission of the offense." *Id.* (*see* cases in accord cited therein); *Torres v. State*, 7 S.W.3d 712, 715 (Tex. App.— Houston [14th Dist.] 1999, no pet.); *see also Willis v. State*, 790 S.W.2d 307,

314 (Tex. Crim. App. 1990) (denial of the "intent" element of theft does not automatically negate an affirmative defense).

*East v. State*, 76 S.W.3d 736, 738 (Tex. App.—Waco 2002, no pet.); *see also Bedolla v. State*, No. 10-11-00268-CR, 2015 WL 1755958, at *1 (Tex. App.—Waco Apr. 16, 2015, no pet.) (mem. op., not designated for publication).

*Resisting Arrest with a Deadly Weapon*

The indictment charging Martinez with resisting arrest with a deadly weapon alleged that he "did then and there, intentionally prevent or obstruct Elmer Tanner, a person the defendant knew to be a peace officer, from effecting an arrest of the defendant, and the defendant did then and there use a deadly weapon, to-wit: a shotgun, to resist, prevent or obstruct the arrest by taking the said shotgun in defendant's hands." Martinez testified that Sheriff Tanner introduced himself to him. Martinez stated that he and Sheriff Tanner were then about to start talking when another officer in full body armor approached and began hitting him and spearing him in the ribs with his gun. Martinez said that after three strikes, he broke free from the officer's grasp, turned around, quickly ran back to where he had laid his shotgun, and grabbed it. Martinez testified that he did it to get the officer to stop hitting him and because he felt like his life was threatened. Martinez stated that Sheriff Tanner then grabbed the shotgun to take it out of his hands but that he held onto the gun "for dear life." He said that he finally let go of the gun when he started to black out.

The State asserts in its brief that Martinez was not entitled to a self-defense instruction because:

> At multiple points throughout his testimony, [Martinez] stated or insinuated that he had not violated the literal language of the penal code. For example: "I'm not resisting. I'm just here[.]" … What is more, at multiple points [Martinez's] testimony suggested that he lacked the requisite culpable mental state. For example, [Martinez] testified that he did not think anybody was going to shoot him when he tried to grab his shotgun after initially putting it down.

In *East*, however, we explained that while the defendant must admit committing the conduct that forms the basis of the indictment, "admitting the conduct" does not always mean admitting the commission of every statutory element of the offense. *East*, 76 S.W.3d at 738 (citing and discussing *Martinez*). We conclude that Martinez admitted to committing the charged conduct, and viewing Martinez's testimony in the light most favorable to Martinez, the evidence raised the issue of self-defense. We thus hold that the trial court erred in denying Martinez's request for a self-defense instruction. *See Johnson v. State*, 157 S.W.3d 48, 52 (Tex. App.—Waco 2004, no pet.); *see also Bedolla*, 2015 WL 1755958, at *3.

We next address whether Martinez suffered "some harm" as a result of the trial court's denial. *Johnson*, 157 S.W.3d at 52 (citing *Ovalle v. State,* 13 S.W.3d 774, 786 (Tex. Crim. App. 2000) (quoting *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*

The trial court submitted a necessity instruction in the resisting-arrest charge that instructed the jury to find Martinez "not guilty" if it found that he reasonably believed

that his conduct was immediately necessary to avoid imminent harm to himself and the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct. During his closing argument, Martinez's counsel focused the jury on the necessity instruction: "And I would ask that inevitably you pay attention to this paragraph here regarding the defense of necessity because that is what this case boils down to. It truly does." Martinez's counsel then explained that there was a "divergence in the issue as far as the facts" and argued that Martinez's version of events was more credible than the State's version. The jury, however, found Martinez guilty of resisting arrest with a deadly weapon, thus demonstrating that they believed the State's version of events and not Martinez's. *See Wooten v. State*, 400 S.W.3d 601, 609 (Tex. Crim. App. 2013). In light of this, Martinez was not harmed by the failure to include a self-defense instruction in the resisting-arrest charge. *See Flores v. State*, No. 13-08-00539-CR, 2009 WL 3136163, at *4 (Tex. App.—Corpus Christi Oct. 1, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding that appellant was not harmed by trial court's refusal to submit self-defense instruction when necessity instruction was given); *see also Wooten*, 400 S.W.3d at 609-10; *Barrios v. State*, 389 S.W.3d 382, 398 (Tex. App.—Texarkana 2012, pet. ref'd).

*Evading Arrest/Detention with a Vehicle*

The indictment charging Martinez with evading arrest/detention alleged that he "did then and there while using a vehicle, intentionally flee from Erik Heilmann, a person the defendant knew was a peace officer who was attempting lawfully to arrest or detain

the defendant." We assume that Martinez admitted the underlying offense.

As stated above, the self-defense statute provides: "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). The resisting-arrest statute is similar in that it provides that one of the elements of the offense is that a person act "by using force against the peace officer or another." *See* TEX. PENAL CODE ANN. § 38.03(a). In *Dobbs v. State*, 434 S.W.3d 166 (Tex. Crim. App. 2014), the Court of Criminal Appeals examined what the Legislature intended by its use of the phrase "using force against the peace officer or another." *Id.* at 170-73. The court stated:

> We conclude that a use of force "against" an officer must necessarily be in opposition to, or in the direction of and/or in contact with, the officer himself, meaning the officer's physical person. A use of force that is against the officer's goal of effectuating an arrest in the sense that it is hostile to or contrary to that goal, but that is not directed at or in opposition to the officer, is not covered by the plain terms of the statute.

*Id.* at 173.

Applying *Dobbs* to this case, we conclude that there is no evidence in the record that Martinez used force against Officer Hielman in using his vehicle to flee from him. Both Officer Hielman and Martinez testified that Martinez fled from Officer Hielman by merely speeding away. The evidence, therefore, did not raise the issue of self-defense. We thus hold that the trial court did not err when it did not submit a self-defense instruction for the evading arrest/detention charge. We overrule Martinez's fourth issues.

## Exclusion of Witness at Punishment

In his fifth issue in each appeal, Martinez contends that the trial court erred when it denied his request to call Mary Lou Fleming as a rebuttal witness. We review the trial court's decision to exclude a witness's testimony for an abuse of discretion. *Taylor v. State*, 173 S.W.3d 851, 853 (Tex. App.—Texarkana 2005, no pet.).

During the punishment phase, the following exchange took place outside the presence of the jury:

> [Defense Counsel]: I'd make the following pro-offer [*sic*] is - - it's Defense's request, at this time, to - - I'd like to call myself as a witness.
>
> THE COURT: Certainly. And you're an Officer of the Court. I will consider you sworn.
>
> [Defense Counsel]: Yes, ma'am. …I'm the lawyer representing Mr. Martinez. Yesterday, during the Punishment - - Phase of trial, Dr. Taft took the stand. Prior to Dr. Taft taking the stand, before the - - before the beginning of the Punishment Phase, the Martinez Family entered the courtroom. The Martinez Family consists of the brother[] of my client, who is name is (sic) Gregorio Martinez Jr; likewise, the sister of my client, … Mary Lou Fleming. Both those individuals were - - during the closing argument phase of the trial, as well as the mother of Mr. Martinez.
> After the closing arguments, we - - we then went into Punishment - - or excuse me - - the Jury deliberated; they came back, found the defendant guilty and we moved into Punishment with myself call, at the late hour, Dr. Taft. I recall some quickness in the - - in the attempts to get Dr. Taft on because of a scheduling issue it being after the - - after the hour of five o'clock. During - - at some point during Dr. Taft's testimony, I - - it became aware to me that the - - that Mr. Martinez' Family, including the individuals that I just[] named - - the three individuals just named were still - - were in the courtroom and were present during the testimony. (sic)
> I instructed my legal assistant … to have them removed from the courtroom, to which they did. They did not hear any further availance (sic) of his testimony. It is my - - it's my intention to attempt to call Gregorio Martinez Junior for the purpose of testifying as to character evidence, background, family evidence, as well as a l[a]ck of criminal - - or

felony conviction.

It's likewise my intention to call Mary Lou Fleming as background, contextual evidence, family history, and lack of any felony or criminal history. It's my -- the -- the violation of the Rule was inadvertent -- it was not intentional on my part or upon my witnesses' part, and we're asking relief of the Court to -- to the Defense to mount a proper Defense under the appropriate provisions under the Code of Criminal Procedure and allowing such witnesses….

Pass the witness.

[Prosecutor]: No questions of [Defense Counsel].

THE COURT: The Court is [*sic*] not find that there was any intent to violate an order by either the attorney or witnesses; however, it -- it was violated. I've allowed the defendant's mother -- I've allowed the Defense, leave of Court to call the defendant's mother[3] and I'm -- my ruling is the same as to the defendant's brother and sister.

Anything further before we bring the jury back in?

[Prosecutor]: I'm sorry, Judge. Your Ruling --

THE COURT: Mom can testify. Brother and sister cannot.

Later, the issue about whether Fleming could testify was again raised:

[Defense Counsel]: May I have a moment on the issue of rebuttal?

THE COURT: You may.

[Defense Counsel]: May we approach?

THE COURT: You may.

(At the Bench, on the record)

[Defense Counsel]: I was [*sic*] like to call Ms. Mary Lou Fleming as a rebuttal witness.

[Prosecutor]: And Judge --

---

[3] The trial court had previously questioned Martinez's mother with the assistance of a translator and ruled that "[b]ased on the language barrier [*sic*], and the fact that the jury heard what Dr. Taft testified to," it was allowing Martinez's mother to testify.

THE COURT:  Rebuttal - -

[Prosecutor]:  - -  I believe this might need to be taken up outside of the jury.

THE COURT:  No.  My qu[e]stion is:  Rebuttal of what?

[Defense Counsel]:  I think the Prosecutor asked my client about the interplay between her and he, leading to a conviction.  I think there was a, mischaracterization as to part of that question.  So I'm not done.  I need to call her as a rebuttal witness to clarify that.

THE COURT:  I believe you probably have cleared that up with your client instead of bring up a rebuttal witness.  So it's denied.

[Defense Counsel]:  Okay.

THE COURT:  Thank you.

(Attorneys return to their table)

Outside the presence of the jury, after both the State and Martinez rested and closed and the jury exited the courtroom, the following exchange then took place:

[Defense Counsel]:  May I make a proffer as to [Fleming's] testimony?

THE COURT:  You may.

[Defense Counsel]:  In response to the testimony that Ms  - - that my client had had an altercation with Ms. Fleming, his sister, that lead [*sic*] to calling the police, I  - -

THE COURT:  You want her in the courtroom?

[Defense Counsel]:  No.  It's my understanding that  - -  that should she be called to testify, is that there was a  - -  an argument regarding my client's request for money from here  - -  that she suspected it was illegal drug usage.  She refused him money  - -  that a phone was broken that was in her possession.  And that her mother was somehow involved in calling the police.  And that it wasn't  - -  it was  - -  since, blown out of proportion.

And so, I - - that's what I proffer her testimony would be.

Is my objection - - with that proffer testimony or showing of proof, I renew my request [to] call … Ms. Fleming as a rebuttal witness.

[Prosecutor]: And, Your Honor, the State would just ask to clarify this portion of the record as well - - that this is the witness that you've previously told Defense counsel he could not call for violating the Rule.

THE COURT: Your objection and request is noted. It's overruled.

[Defense Counsel]: And may I put something else on the record, Your Honor?

THE COURT: Certainly.

[Defense Counsel]: Ms. Fleming was in the courtroom after - - after you denied her ability to testify. Initially, she was in the courtroom for a period of time watching the proceedings. As soon as the information, with regards - - was elicited - - or regarding the interplay between her and her brother during the State's cross examination of my client, as soon as that information was elicited, may the record reflect that I - - that I turned to her, instructed her - - and instructed her to leave the courtroom and wait outside. May that … be noted on the record?

THE COURT: Certainly.

[Defense Counsel]: And I think that I - - I still have my request - - my request is still out there to respectfully request the Court to change it's [*sic*] ruling with regards to her testimony; is that denied?

THE COURT: Yes, sir.

Texas Rule of Evidence 614, commonly referred to as "the Rule," provides that at the request of a party, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. TEX. R. EVID. 614. The Rule is designed to prevent witnesses from altering their testimony, consciously or not, based on other witnesses' testimony. *Routier v. State*, 112 S.W.3d 554, 590 (Tex. Crim. App. 2003); *Webb v. State*, 766 S.W.2d 236,

239 (Tex. Crim. App. 1989). Disqualification of a defense witness for such witness's violation of the Rule must be viewed in light of the defendant's constitutional right to call witnesses on his or her behalf. *See Davis v. State*, 872 S.W.2d 743, 745 (Tex. Crim. App. 1994). The appellate court determines:

> (1) if the rule was violated and the witness was disqualified, were there particular circumstances, other than the mere fact of the violation, which would tend to show the defendant or his counsel consented, procured or otherwise had knowledge of the witness's presence in the courtroom, together with knowledge of the content of that witness's testimony; and (2) if no particular circumstances existed to justify disqualification, was the excluded testimony crucial to the defense.

*Routier*, 112 S.W.3d at 590 (quoting *Webb*, 766 S.W.2d at 245).

There is no indication in this case that Fleming's testimony was crucial to Martinez's defense. Martinez does not state in his brief that Fleming's testimony was crucial; rather, he argues only that the trial court erred by denying him "the opportunity to put on *relevant* evidence to assist the trier of fact in determination of an appropriate sentence." [Emphasis added.] Furthermore, the trial court stated that it believed Martinez's counsel had already "cleared up" the "mischaracterization" for which Fleming was being called to rebut. We therefore conclude that the trial court did not err when it denied Martinez's request to call Fleming as a rebuttal witness. We overrule Martinez's fifth issues.

### Improper Comment in the Jury's Presence

In his sixth issues in each appeal, Martinez contends that the trial court erred when it made an improper comment in the presence of the jury concerning a defense request for a rebuttal witness. Martinez's complaint concerns the following exchange, which the

record states was at the trial court bench:

> [Defense Counsel]: I was [*sic*] like to call Ms. Mary Lou Fleming as a rebuttal witness.
>
> ….
>
> THE COURT: No. My qu[e]stion is: Rebuttal of what?
>
> [Defense Counsel]: I think the Prosecutor asked my client about the interplay between her and he, leading to a conviction. I think there was a, mischaracterization as to part of that question. So I'm not done. I need to call her as a rebuttal witness to clarify that.
>
> THE COURT: I believe you probably have cleared that up with your client instead of bring up a rebuttal witness. So it's denied.

"Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial." *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013). The "traditional and preferred procedure" for seeking relief at trial for a complaint that must be preserved is "(1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if a party thinks an instruction to disregard was not sufficient." *Id.* at 98-99 (quoting *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004)). A party may skip the first two steps and request a mistrial, but he will be entitled to one only if a timely objection would not have prevented, and an instruction to disregard would not have cured, the harm flowing from the error. *Id.* at 99.

Here, Martinez did not object to the trial court's remarks, request an instruction to disregard, or move for a mistrial. Martinez's complaint that the trial court's above-quoted statement was an improper comment to the jurors on the evidence in the trial was

therefore not preserved. *See id.*; *Bryant v. State*, 455 S.W.2d 235, 236 (Tex. Crim. App. 1970).

Martinez argues that the Court of Criminal Appeals held in *Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000) (plurality op.), that when a trial court makes an improper comment in the presence of the jury, no objection is needed to preserve the claim. The Court of Criminal Appeals, however, has stated that "the *Blue* decision has no precedential value." *Unkart*, 400 S.W.3d at 99. Furthermore, the circumstances in this case differ from the circumstances in *Blue*. We therefore overrule Martinez's sixth issues.

Having overruled all of Martinez's issues, we affirm the trial court's judgments.


REX D. DAVIS
Justice

Before Chief Justice Gray,
  Justice Davis, and
  Justice Scoggins
  (Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed August 27, 2015
Do not publish
[CR25]

* (Chief Justice Gray concurs only in the Court's judgment to the extent it affirms the trial court's judgment. A separate opinion will not issue.)

